## A03A1479. HOLLIDAY v. THE STATE.
(588 SE2d 833)

SMITH, Chief Judge.

Harvey Holliday was convicted on three counts of theft by deception. Following the denial of his amended motion for new trial, he appeals. All five of his enumerations of error concern the use of an

---

[3] Compare *Jennette v. Nat. Community &c. Svcs.*, 239 Ga. App. 221, 225 (4) (520 SE2d 231) (1999).

interpreter who translated the testimony of three Spanish-speaking witnesses at trial. We find no legal error with respect to use of the interpreter or the interpreter's performance at trial. Moreover, even if some deficiency or error occurred by virtue of the interpreter's translation, we conclude that there is no reasonable probability that the deficiency or error contributed to the jury's verdict. We therefore affirm.

Construed in favor of the verdict, evidence was presented through the testimony of two victims that they hired Holliday to handle immigration matters after he represented himself as an attorney to them. Holliday was not an attorney. With the assistance of a Spanish-speaking interpreter, the first victim testified that upon the referral of Holliday's secretary, he met with Holliday and "hired him to handle a family package." He believed that Holliday would arrange for legal residency for his wife and several other family members. Holliday told the victim that he was a "good attorney" who handled "a lot of cases" involving immigration matters. He believed that he was "receiving help from a regular licensed State of Georgia attorney." Over the course of several months, between October 1996 and January 1998, the victim paid Holliday approximately $6,100 for his services. After a period of time passed and these tasks were not accomplished, however, the victim asked Holliday for explanations about the delay, and "his answers were always evasive. . . . He would say that he was working on it and that now he was going to really put a lot of effort into it. And, hypocritically, he would embrace me. And then he would get down on his knees and he would say that he was really going to work on it."

Finally, dissatisfied with Holliday's work, the victim enlisted the help of an English-speaking acquaintance to act as an interpreter. Along with two other individuals, they went to Holliday's office, and the victim asked Holliday to show him his case file. The victim wanted "to see how our case was going with immigration, because he never would give us anything." Holliday responded in an aggressive manner. "He was like a person who was going to attack next thing," and "in a very ugly way, he threw us out of his office. He had already thrown us out of his office once before." The victim never spoke to Holliday again and obtained assistance with his immigration needs from at least two other attorneys. At the time of trial, which occurred in January 2001, although he had obtained some results, his "dealings in regard to [his] family's status" were ongoing. When asked whether he received from Holliday what he "bargained for," the victim replied that he did not receive "even nice treatment or any kind of proof of the work that he was supposed to be doing."

The second victim was assisting a family member with paperwork at the Department of Immigration and Naturalization

Services when he met Holliday. He noticed "people coming up to Mr. Holliday and asking him questions. And then they would go do something." This victim asked Holliday if he could refer him to "a good immigration attorney," and Holliday replied, "You have found him, the best in town, the fastest. And I'm it." Believing Holliday to be an attorney, he hired Holliday to handle several immigration matters for four different family members. Over a period of several months, he paid either Holliday or his wife at least $2,000 in exchange for Holliday's services. He also gave Holliday a check and at least two money orders, all made out to INS, which were not forwarded to INS or otherwise processed.

When this victim learned that the check he had written to INS had not cleared his bank, he told Holliday he wanted to do his "own work" and obtained his file from Holliday. On review of the documents in the file, he discovered an INS form denying two work permit requests on the ground that INS had not received additional information, which it had previously requested. The form further recited that if the recipient could give "a good reason" for failing to provide the information, INS would reopen the case. The victim testified that he "never received anything . . . on the request for more information. It did not come to me." When Holliday failed to attend an appointment with INS on behalf of another family member, the victim conducted his own investigation and learned that Holliday was not an attorney. The victim testified that "the four paperworks that [Holliday] filled out were all doomed to death" and never would have "made it through INS, for various reasons."

The State introduced similar transaction evidence through the testimony of two other witnesses. With the aid of an interpreter, the first witness testified that he retained Holliday in August 1998 to help him "get permission to work." Holliday told him he was "a good attorney, and he was going to resolve my case fast." He paid Holliday approximately $2,400. After his visa expired, he asked Holliday "for proof that my documents were at the immigration office. He always evaded me, excuse after excuse." He finally called INS and "found out that they had not received any document." Despite the witness's demands, Holliday refused to refund any portion of his money. The witness hired an immigration attorney to assist him, and he testified that his immigration status was "not good."

The other witness similarly testified with the interpreter's assistance that he believed Holliday to be a licensed attorney handling immigration matters on his behalf. He paid Holliday $1,200 in return for Holliday's promise "that he was going to get me my green card, first for myself and then for my child who was born in Mexico." Several months passed after the witness retained Holliday, and the witness inquired about his status at INS and "found out that I didn't

even exist in their system." Evidence was presented that he had given Holliday money orders totaling $1,400 made out to INS, which never reached that agency. The witness testified that he paid the money order company to conduct an investigation and that he received in return copies of the money orders "with the signatures superimposed over what I had originally written on them." The name, "Jackie Reece, Jr.," appeared on both money orders. Jackie Reece is Holliday's wife.

A witness employed by Holliday as a front-desk clerk and interpreter for a short time in 1998 believed he was an attorney when she began working for him. She testified that she heard him "refer to himself as an attorney to the people that came to the office."

Holliday, who allegedly does not speak Spanish, raises a number of contentions all related to the use of the court-appointed translator who assisted at trial. All of his arguments can be summarized by his statement in his appellate brief that "[a]s a result of the poor interpretation in this case, Defendant was denied his right to due process, to a fair trial, and to the assistance of counsel." In support of his arguments, Holliday relies largely on an independent interpreter's testimony given during the hearing on his motion for new trial. This interpreter testified that before the hearing, she compared the trial transcripts with the court reporter's tapes. Although Holliday contends that the trial interpreter made several errors and omissions in translation, Holliday points out in his brief only two allegedly significant "errors in translation." Both instances involve material spoken in Spanish, which was not translated by the interpreter into English.

First, the independent interpreter testified that one of the victims testified in Spanish that when he went to Holliday's office, he noticed "a smell of whiskey." This phrase, however, was not translated into English. Holliday argues that one or more jurors may have understood Spanish and may have understood this improper character evidence. Second, the independent interpreter stated that one of the similar transaction witnesses testified in Spanish that an INS employee referred to him as "another of Mr. Holliday's victims." Again, however, this statement was not translated into English by the trial interpreter. In fact, at the time the witness made this statement at trial, one of the prosecutors interjected, "Your Honor, I understand Spanish enough to know that that was nonresponsive and hearsay." In response, the court instructed the interpreter not to repeat this portion of the witness's testimony. Holliday argues that if this comment had been "correctly interpreted as required, trial counsel would have objected to this harmful testimony."

To conclude that any juror understood the words actually spoken by Spanish-speaking witnesses is nothing more than mere speculation. But even assuming that one or more jurors understood the

Spanish word for "whiskey" and understood the hearsay statement concerning another of Holliday's "victims," the evidence against Holliday was overwhelming. Both victims testified that Holliday represented himself as an attorney, each victim paid Holliday a substantial amount of money in return for his services, and neither victim received the services for which he bargained.

The testimony of the two similar transaction witnesses further supports the conclusion that Holliday habitually held himself out as an attorney to Spanish-speaking individuals, convinced them to retain him for assistance with immigration matters, and then failed to represent the victims as he had promised. Even assuming that error occurred when the trial interpreter failed to translate these terms or phrases into English, it is axiomatic that "[h]arm as well as error must be affirmatively shown by the record to obtain reversal. [Cit.]" *Evans v. State*, 233 Ga. App. 879, 880 (2) (506 SE2d 169) (1998). And "[h]arm cannot be shown by mere speculation and conjecture unsupported by the record. [Cit.]" Id. Holliday is complaining about objectionable material that the jury did not hear. Given the overwhelming evidence of Holliday's guilt, his arguments that a different result might have obtained if the interpreter had fully translated the offending material are nothing more than conjecture and provide no basis for reversal.

Holliday argues that the trial court erred in failing to determine the interpreter's qualifications prior to trial and that, indeed, the interpreter was not qualified to translate. But the interpreter, who was assigned to the trial by a court administrator, testified during the hearing on Holliday's motion for new trial that she is a certified court interpreter in the State of Georgia. She had attended the mandatory orientation given by the State of Georgia Supreme Court Commission on Interpreters (the "Commission"), had taken and passed an English-only written exam, and had passed the "oral exam that is the standard for the national consortium for state court[s]." Although her actual certificate was not issued by the Commission until after the trial of this case occurred, the interpreter had passed the American Translator's Association test "before certification was even established here in the state of Georgia. So technically, I became the very first state-certified interpreter in the state of Georgia." Her passing scores on an oral exam she took in Florida were accepted in Georgia, because the exam is a nationally accepted test now administered in Georgia. She testified that she is the lead instructor with the Commission, and she trains judges concerning "how to work [with] interpreters." She also teaches a post-graduate interpreter certificate program at Georgia State University. Although, as pointed out by Holliday, the trial interpreter did not have a college degree and could not state the number of trials in

which she had assisted, given her training and credentials, we cannot agree that she was not qualified to serve as a translator in Holliday's trial.

Holliday similarly contends that the trial court should have dismissed the interpreter when her interpretation became "suspect." It is true that the interpreter asked witnesses to repeat themselves at times and that, on occasion, she explained that she needed repetition or clarification of a witness's answer or a ruling by the court. But contrary to demonstrating that her ability to translate was suspect, the interpreter's requests for repetition or clarification demonstrate her careful attempt to translate accurately the witness's testimony. Holliday also argues that he was denied effective assistance of counsel because his trial attorney failed to retain the services of an independent translator at the time of trial. But he *did* utilize a highly trained independent interpreter after trial, who reviewed the trial transcript. As discussed above, the independent translator provided no information affirmatively showing that Holliday suffered harm as a result of the trial interpreter's translation. Holliday can hardly argue that use of an independent translator at trial would have caused the jury to reach a different result.

Holliday correctly points out that due process concerns are raised when a foreign defendant cannot understand the language spoken to him and when the accuracy of a translation is subject to "grave doubt." *United States v. Cirrincione*, 780 F2d 620, 634 (7th Cir. 1985). It would stand to reason that similar concerns might arise when, as here, the defendant speaks English, but the victim speaks another language. As the number of non-English-speaking individuals in the United States continues to grow, it is certainly foreseeable that courts will likely face serious issues related to translation. But such issues are not involved in this case. The trial translator was qualified, the jury did not hear potentially prejudicial information spoken in English, and no matter how often the translator sought repetition or clarification, the evidence of Holliday's guilt was overwhelming. We find no basis for reversal.

*Judgment affirmed. Ruffin, P. J., and Miller, J., concur.*

DECIDED OCTOBER 17, 2003 — 

*David S. West*, for appellant.

*Patrick H. Head, District Attorney, Amelia G. Pray, Victoria S. Aronow, Dana J. Norman, Assistant District Attorneys*, for appellee.