## A04A0420. BALDIVIA v. THE STATE.
(599 SE2d 188)

BLACKBURN, Presiding Judge.

Following his convictions for armed robbery[1] and possession of a firearm during the commission of a crime,[2] Arturo Baldivia appeals the denial of his motion for new trial, arguing, among other things, that: (1) the evidence was insufficient to support his convictions; (2) the State improperly introduced evidence which constituted comments on his silence after he was arrested and given *Miranda* warnings; (3) his rights were violated because the court-provided interpreter failed to translate effectively for him; (4) the trial court failed to properly charge the jury on the meaning and necessity of intent as an element of armed robbery and possession of a firearm during the commission of a crime; and (5) he did not receive effective assistance of counsel. For the reasons that follow, we affirm.

1. In several enumerations of error, Baldivia challenges the sufficiency of the evidence supporting his convictions.

On appeal from a criminal conviction, the evidence must be viewed in the light most favorable to the verdict, and the defendant no longer enjoys the presumption of innocence; moreover, an appellate court does not weigh the evidence or determine witness credibility but only determines whether the evidence is sufficient under the standard of *Jackson v. Virginia.*[3] Conflicts in the testimony of the witnesses, including the State's witnesses, are a matter of credibility for the

---

[1] OCGA § 16-8-41 (a).
[2] OCGA § 16-11-106.
[3] *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

jury to resolve. As long as there is some competent evidence, even though contradicted, to support each fact necessary to make out the State's case, the jury's verdict will be upheld. The testimony of a single witness is generally sufficient to establish a fact.

*Herring v. State.*[4]

So viewed, the evidence shows that on the evening of September 8, 2001, Cassie Valencia and Jose Verduzco went to a bar in Cobb County. Later in the evening, Baldivia, who had been involved with Valencia and had broken up with her the week before, entered the bar, accompanied by Oscar Lopez and Cecilia Perez. Valencia and Verduzco did not speak to Baldivia or his companions. Later, when Verduzco went to the men's room, Lopez followed him and had an argument with him in the bathroom. The argument ended when Baldivia entered the bathroom and separated the two men. After Verduzco's encounter with Baldivia and Lopez in the men's room, Valencia and Verduzco left the bar and drove to her apartment.

Around 8:30 the next morning, Valencia heard a knock at her door. When she opened the door, Baldivia and Lopez pushed their way into her living room and began yelling at Verduzco. Valencia retreated to the bedroom, but when she heard sounds of a struggle, she returned to the living room and found Verduzco and Lopez fighting. Valencia shouted at them to stop fighting; eventually they stopped, and Baldivia and Lopez left.

After Baldivia and Lopez left, Valencia noticed that the keys to her car, her apartment, and her parents' home were missing from her living room table. Unable to find the keys, Valencia called a locksmith, who made new keys that afternoon.

Around 3:00 that afternoon, Valencia and Verduzco drove to his apartment in her white 1998 Chevrolet Blazer. As they were getting some items and clothes out of the back of the Blazer, Valencia saw Baldivia in his white Suburban coming slowly down the driveway toward her. As she pointed Baldivia out to Verduzco, Baldivia accelerated; the vehicle came within ten or fifteen feet of Valencia and Verduzco, and Lopez, who was in the backseat, pointed a handgun out of the window and fired at them. Verduzco fled in one direction and Valencia in another; as she fled, Valencia saw Lopez get out of the Suburban and into her Blazer. Both Valencia and Verduzco got to a telephone and called the police. They returned to the parking lot about ten or fifteen minutes later to find Valencia's Blazer missing. When the police arrived, Valencia told them what had happened,

[4] *Herring v. State*, 263 Ga. App. 470 (1) (588 SE2d 286) (2003).

identified Baldivia as the person driving the Suburban and Lopez as the one who had fired the gun, and rode with the police to their apartment to see if they were there.

Later that day, while the police continued to look for Baldivia and Lopez, Valencia and her parents began their own search. In an alley behind a body shop to which Valencia once had gone with Baldivia, they found Baldivia's Suburban. Valencia called the police, but before the police arrived, Baldivia, Lopez, and Perez returned to the Suburban and drove away. Valencia and her parents followed, maintaining telephone contact with the police as they did so. Within minutes, Atlanta police stopped the Suburban, and its occupants were arrested. During an inventory search of the car, police found a 9 mm semiautomatic pistol, Valencia's keys, and an insurance document indicating that Baldivia had given a false name to the police when the car was stopped. A firearms examiner with the Georgia Bureau of Investigation testified that a cartridge case found by the police in the parking lot of Verduzco's apartment complex had been fired from the handgun found in the Suburban.

The following evening, Valencia and her parents continued their own search for the Blazer. Valencia contacted one of Baldivia's former employers. He told Valencia and her parents that he was on the line with Baldivia and Lopez, who were at the jail, and did a three-way call between Valencia, Baldivia, and Lopez. Valencia pleaded with Baldivia to tell her the location of her car, but at first Baldivia told her he would not tell her its location unless she dropped the charges against him. When Valencia stated that she could not drop the charges because he had shot at her, Baldivia exclaimed, "We didn't shoot at you. We shot in the air." After numerous phone calls between Valencia and the jail in which Valencia was unable to get understandable directions about the location of the car from either Baldivia or Lopez, Baldivia arranged for a friend to meet Valencia and her parents at a McDonald's restaurant and take them to the car. Baldivia's friend met them as arranged and led them to an apartment complex where they found the car, without tags and vandalized, hidden in an alley. This evidence was sufficient to support Baldivia's convictions.

Baldivia maintains that the State failed to produce any evidence that either he or Lopez took anything from the victims' persons or immediate presence. He points out that Valencia and Verduzco left the parking lot for ten to fifteen minutes, during which time Valencia's Blazer was taken, and that neither Valencia nor Verduzco saw or heard the car leave.

"A person commits the offense of armed robbery when, with intent to commit theft, he or she takes property of another from the person or the immediate presence of another by use of an offensive weapon." OCGA § 16-8-41 (a).

It has long been recognized, however, that when perpetrators forcibly cause the victim to be away from the immediate presence of the property at the time it is stolen, the offense of armed robbery can still be committed. Further, the concept of immediate presence is broadly construed if the object taken was under the victim's control or responsibility and the victim is not too distant.

(Citations omitted.) *Morgan v. State.*[5] Since the Blazer was under Valencia's control and was stolen after Baldivia and Lopez had threatened Valencia with a gun and forcibly caused her to be away from the immediate presence of the property, that was sufficient to constitute a theft from her immediate presence.

Baldivia next argues that the State produced no evidence showing that he had knowledge that Lopez had Valencia's keys or that Lopez had a gun and intended to use it; he also argues that the State failed to produce any evidence that he aided or abetted Lopez in the commission of the crime of armed robbery. We disagree.

OCGA § 16-2-20 provides, in pertinent part:

Every person concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of the crime. . . . A person is concerned in the commission of a crime only if he . . . [i]ntentionally aids or abets in the commission of the crime; or [i]ntentionally advises, encourages, hires, counsels, or procures another to commit the crime.

Criminal intent may be found by the jury upon consideration of the words, conduct, demeanor, motive, and all other circumstances connected with the act for which the accused is prosecuted. Presence, companionship and conduct before and after the offense are circumstances from which one's participation in the criminal intent may be inferred. Additionally, conspiracy may be proven by direct or circumstantial evidence.

(Citation and punctuation omitted.) *Leigh v. State.*[6]

A criminal conspiracy is a partnership in crime, and there is in each conspiracy a joint or mutual agency for the

---

[5] *Morgan v. State*, 195 Ga. App. 732, 734 (1) (394 SE2d 639) (1990).
[6] *Leigh v. State*, 223 Ga. App. 726, 729 (2) (478 SE2d 905) (1996).

prosecution of a common plan. Thus, if two or more persons enter into a conspiracy, any act done by any of them pursuant to the agreement is, in contemplation of law, the act of each of them and they are jointly responsible therefor. This means that everything said, written, or done by any of the conspirators in execution or furtherance of the common purpose is deemed to have been said, done, or written by each of them. And this joint responsibility extends not only to what is done by any of the conspirators pursuant to the original agreement but also to collateral acts incident to and growing out of the original purpose. . . . Under OCGA § 16-2-20, as parties to a crime, participants may be convicted of a crime even though they are not the actual perpetrator. . . . In this state, a defendant can be convicted of armed robbery even though he might not have had knowledge that his accomplice was going to use a weapon to perpetrate it, so long as it can be found that use of the weapon by the accomplice was naturally or necessarily done in furtherance of the conspiracy to commit the robbery even though not part of the original agreement.

(Punctuation omitted.) *Crawford v. State*.[7]

Applying these principles to the facts of this case, the evidence is sufficient to sustain Baldivia's convictions for armed robbery and possession of a firearm during the commission of a felony under *Jackson v. Virginia*, supra. The evidence showed that Valencia's keys were missing after Baldivia and Lopez left her apartment. Baldivia was driving the Suburban at the time Lopez fired shots at Valencia and Verduzco from inside the vehicle, Baldivia and Lopez left the scene after the shots were fired, and Valencia discovered shortly thereafter that her Blazer had been taken. When Baldivia was arrested, Lopez was a passenger in his vehicle, and a gun and the keys to the Blazer were found in the Suburban. Tests on the shell casing found in the parking lot showed that it had been fired from the gun found in Baldivia's Suburban. Baldivia talked with Valencia on the telephone, told her he would not tell her where her Blazer was unless she agreed to drop the charges, and exclaimed, when she charged him with shooting at her, "We didn't shoot at you. We shot in the air." Finally, Baldivia tried to tell Valencia where to find her Blazer and arranged for a friend of his to lead her to her car. The evidence was more than sufficient to support Baldivia's convictions.

2. Baldivia asserts that, in two instances, the State improperly introduced evidence which constituted comments on his silence after

---

[7] *Crawford v. State*, 210 Ga. App. 36, 37-38 (1) (435 SE2d 64) (1993).

he was arrested and given *Miranda* warnings. In the first instance, the arresting officer was being questioned on direct examination by the prosecuting attorney.

> Q. When you placed the defendant, this defendant under arrest, did you read him *Miranda* or do you know if *Miranda* was given to him?
> A. Yes, it was, once we — we took everybody, collected everything, the vehicle, and we took them to the precinct, which is just a block away from the location we were at.
> Q. Did he seem to comprehend English when you were talking with him?
> A. From what I recall, somewhat.
> Q. Did he make any statements at all to you?
> A. Not that I recall.
> Q. Would you have noted if he had?
> A. I would have noted it in my report.
> Q. So you don't recall — you would have noted in your report if he said I wasn't involved in this?
> A. Yeah, I would have noted that in my report, that he stated that.
> Q. Thank you, sir.

The second instance of which Baldivia complains occurred during the prosecuting attorney's cross-examination of Baldivia.

> Q. Now, when [the handgun] was shown to you, you never said anything about that gun to the police?
> A. What was that?
> Q. You've never said anything — you never — this is found in your vehicle. It's about a shooting. It's about an armed robbery. You're being implicated. You've never said anything about it not being yours or involved.
> A. The moment that we were arrested, I wasn't allowed to talk. They told me I wasn't to say anything, and I believe the police has the last word. They're the authority.
> Q. You're right. You don't have to say anything.

It is well established that "[e]vidence as to silence on the part of the defendant at the time of his arrest should be excluded when objected to, for he is then entitled to remain silent, and the prosecution may not use against him the fact that he stood mute or claimed his privilege." *Reid v. State.*[8] However, even assuming that the prosecuting attorney's questions constituted improper comment on

---

[8] *Reid v. State*, 129 Ga. App. 660, 664 (5) (200 SE2d 456) (1973).

Baldivia's silence, "this error was not preserved for appellate review because trial counsel did not object to the prosecutor's questions or argument." *Landers v. State.*[9]

3. Baldivia argues that his rights were violated because the court-provided interpreter failed to translate effectively for him. Here again, this issue was waived by Baldivia's failure to interpose a timely objection to the interpreter's translation.

We note that even if Baldivia had made a timely objection to the work of the interpreter, this enumeration of error would provide no basis for reversal. The "errors in translation" to which Baldivia points are actually occasions, during the course of the testimony, on which the interpreter informed the court that she was either unable to think of a word or having difficulty following a line of questioning. On each occasion, however, Baldivia nonetheless understood and answered the question. Even assuming that an error in translation occurred when the interpreter acknowledged that she could not think of a word or follow the questioning, "it is axiomatic that harm as well as error must be affirmatively shown by the record to obtain reversal." (Punctuation omitted.) *Holliday v. State.*[10] Baldivia has "fail[ed] to show in which respects the faulty translation was harmful." *Rodriguez v. State.*[11] Accordingly, this enumeration of error has no merit.

4. Baldivia argues that the trial court failed to properly charge the jury on the meaning and necessity of intent as an element of armed robbery and possession of a firearm during the commission of a crime. We find no error. The trial court charged the jury as follows:

> Intent is an essential element ... and must be proven by the State beyond a reasonable doubt. Intent may be shown in many ways provided that you, the jury, believe that it existed from the proven facts before you. It may be inferred from the proven circumstances or by acts and conduct, or it may be in your discretion inferred when it is the natural and necessary consequences of the act. Whether or not you draw such an inference is a matter solely within your discretion. This defendant will not be presumed to have acted with criminal intent, but you may find such intention, or the absence of it, upon a consideration of the words, conduct, demeanor, motive and other circumstances connected with the acts for which the accused is prosecuted.

---

[9] *Landers v. State*, 270 Ga. 189, 190-191 (2) (508 SE2d 637) (1998).
[10] *Holliday v. State*, 263 Ga. App. 664, 668 (588 SE2d 833) (2003).
[11] *Rodriguez v. State*, 271 Ga. 40, 46 (5) (d) (518 SE2d 131) (1999).

This language is that of the pattern jury instruction, and the trial court did not err in so charging.

Baldivia maintains that the trial court's "original charge of intent failed to inform the jury that in order to find the Appellant guilty of armed robbery and possession of a firearm during the commission of a crime, they must find that the Appellant had the requisite criminal intent when he drove Mr. Lopez to the crime scene." This is not a correct statement of the law. With respect to the crime of armed robbery, "there must be intent to commit theft, but it is not necessary that such intent exist for any particular period of time before the armed robbery, rather, the intent referred to simply must exist concurrent in time with the act." (Punctuation omitted.) *Wallace v. State.*[12] The same would be true with respect to the crime of possession of a firearm during the commission of a crime, intertwined as it is with the crime of armed robbery.

5. Baldivia asserts, on several grounds, that he did not receive effective assistance of counsel.

> The burden of establishing the ineffective assistance of trial counsel is a heavy one that requires an appellant to establish both that counsel's performance fell below an objective standard of reasonableness, and that, but for counsel's deficient performance, there is a reasonable probability that the outcome of the trial would have been different. Regarding this second prong, it is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceedings, he must establish a reasonable probability that but for the error, his trial would have ended differently. A failure to make a sufficient showing on either of these prongs will be fatal to a claim of ineffective assistance.

(Punctuation and footnotes omitted.) *Wallace v. State.*[13] "We must affirm a trial court's finding that a defendant has not been denied effective assistance of counsel unless it is clearly erroneous." *Mitchell v. State.*[14]

(a) Baldivia maintains that his trial counsel failed to provide him with effective assistance because he did not request a probable cause hearing.

> The purpose of a preliminary probable cause hearing is to dismiss at the earliest possible date those charges for which

---

[12] *Wallace v. State*, 175 Ga. App. 685, 686 (2) (333 SE2d 874) (1985).
[13] *Wallace v. State*, 272 Ga. 501, 503-504 (3) (530 SE2d 721) (2000).
[14] *Mitchell v. State*, 242 Ga. App. 177, 179 (4) (529 SE2d 169) (2000).

no probable cause is shown. See Rule 26.2 (A) (7) of the Uniform Superior Court Rules. Once there has been an indictment on a charge, probable cause has, by definition, been shown. Failure to hold a preliminary probable cause hearing pursuant to Rule 26.2 provides no ground for appellate review once there has been an indictment and conviction.

*Dubose v. State.*[15] Since, after indictment and conviction, the lack of a probable cause hearing cannot constitute reversible error, it follows that, even if his trial counsel somehow rendered ineffective assistance by failing to request the hearing, Baldivia cannot establish any prejudice or harm to his defense resulting therefrom.

(b) Baldivia next contends that trial counsel's performance was deficient because he did not subpoena or interview certain witnesses. "But the content of their testimony is mere speculation because the potential witnesses did not testify at the motion for new trial hearing. Without such evidence, [Baldivia] cannot meet his burden of affirmatively showing how trial counsel's failure affected the outcome of his case." *Turner v. State.*[16]

(c) Baldivia maintains that he did not receive effective assistance of counsel because trial counsel did not seek scientific testing on various items of evidence. However, as he again does not show how the failure to request these scientific tests affected the verdict in this case, the trial court did not abuse its discretion in denying this claim of ineffective assistance. *Brower v. State.*[17]

(d) Baldivia complains that trial counsel's representation was deficient because he did not meet more often with Baldivia before trial. However, Baldivia "does not describe for us how additional pre-trial communications would have changed the outcome of his trial. Therefore, he has failed to establish that this alleged instance of ineffectiveness prejudiced his defense." *Washington v. State.*[18]

(e) Baldivia also argues that his trial counsel's performance was deficient because he did not object to the State's introduction of evidence of, and comment on, his post-arrest silence. See Division 2, supra. "[W]e need not determine whether counsel performed deficiently, because we conclude that in all likelihood, the failure to object did not contribute to the proceeding's outcome." *Wallace,* 272 Ga. at 504 (3) (a).

---

[15] *Dubose v. State,* 187 Ga. App. 293, 297 (7) (369 SE2d 924) (1988).
[16] *Turner v. State,* 253 Ga. App. 760, 764 (6) (560 SE2d 539) (2002).
[17] *Brower v. State,* 230 Ga. App. 125, 127 (4) (495 SE2d 600) (1998).
[18] *Washington v. State,* 274 Ga. 428, 430 (2) (554 SE2d 173) (2001).

[Baldivia] has failed to show that he was prejudiced by his counsel's failure to . . . object to the prosecutor's improper comments[, and g]iven the overwhelming evidence of [Baldivia's] guilt, he cannot show a reasonable probability that the jury would have had a reasonable doubt respecting his guilt, if his counsel had . . . made the proper objection to the state's cross-examination and argument.

*Landers*, supra at 191 (4).

(f) Baldivia next contends that his trial counsel's performance was deficient because he failed to object to the interpreter's inability to translate and keep up with the discourse. Having concluded in Division 3, supra, that, even if there were error with respect to the interpreter's translation such error would be harmless, it follows that Baldivia cannot prove the prejudice or harm necessary to a viable claim of ineffective assistance of trial counsel.

6. We have reviewed Baldivia's remaining enumerations of error and find that they either lack citation of authority and argument, and are therefore abandoned pursuant to Court of Appeals Rule 27 (c) (2), or are devoid of merit.

*Judgment affirmed. Barnes and Mikell, JJ., concur.*

DECIDED APRIL 7, 2004 —
RECONSIDERATION DISMISSED MAY 6, 2004.

*Barry Staples*, for appellant.
Arturo Baldivia, *pro se*.
*Patrick H. Head, District Attorney, Amelia G. Pray, Laura J. Murphree, Assistant District Attorneys*, for appellee.