**THIRD DIVISION**
**ELLINGTON, P. J.,**
**DILLARD and MCFADDEN, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**November 18, 2015**

# In the Court of Appeals of Georgia

A15A1257. CISNEROS v. THE STATE.                    JE-044C

ELLINGTON, Presiding Judge.

Gustavo Cisneros and eight others[1] were indicted in the Superior Court of Gwinnett County for crimes arising out of a series of home invasions. Cisneros was tried separately in 2008 on the 24-count indictment, and the jury found him guilty of eight counts of burglary (Counts 1, 5, 7, 9, 12, 15, 18, and 22),[2] six counts of armed robbery (Counts 2, 6, 8, 10, 13, and 16),[3] two counts of criminal attempt to commit

---

[1] The other co-indictees were Gonzalo Ortega, Jose Martinez, Hugo Hernandez Delfino, Paulino Gonzalez Martinez, Mario Alberto Silverio, Jaime Carrera-Carmago, Cecilio Castro-Delacruz, and Javier Alonso Quiroz.

[2] OCGA § 16-7-1.

[3] OCGA § 16-8-41 (a).

armed robbery (Counts 19 and 23),[4] two counts of aggravated sexual battery (Counts 3 and 4),[5] and one count of sexual battery (Count 14).[6] The jury found him not guilty on the remaining five counts. On appeal, Cisneros claims that the evidence was insufficient to support his convictions on Counts 1 through 10, 14, 18, and 19. He also contends that he received ineffective assistance of trial counsel. For reasons that follow we conclude that the evidence was insufficient as to Counts 1 through 6, 18, and 19, and we reverse Cisneros's convictions as to those counts. The remainder of Cisneros's convictions are affirmed

Viewed in a light most favorable to the jury's verdict,[7] the evidence shows that from February to April 2004, several Gwinnett County homes were invaded by masked gunmen who tied up their victims and stole money, jewelry, and other property. In chronological order, and by reference to the street on which they occurred and the corresponding counts of the indictment for which Cisneros was convicted, the home invasions at issue are as follows:

---

[4] OCGA § 16-4-1; OCGA § 16-8-41 (a).

[5] OCGA § 16-6-22.2.

[6] OCGA § 16-6-22.1.

[7] See *Jackson v. Virginia*, 443 U.S. 307 (99 SCt 2781, 61 LEd2d 560) (1979).

(a) *Oakland Walk Court (Counts 1 through 4)*. During the early morning of February 25, 2004, a resident of a home on Oakland Walk heard a loud noise; shortly thereafter, "four or five" masked men armed with guns entered her bedroom. The men pointed guns at her and demanded money, and she gave them her gold jewelry. They also took her cell phone and the keys to her van. One of the men then penetrated the victim's vagina with his hand. Before they left, the men tied her hands behind her back with shoelaces and gagged her.

The first victim's mother was also in the house. Five masked gunmen, who were speaking in Spanish, knocked down the door to her bedroom, and one of them hit her in the head with his gun. The men took some compact discs and jewelry, and they demanded money, after which she gave them $100. One of the men put his hand in the second victim's vagina. Before leaving, they tied her hands and feet with shoelaces and put tape over her mouth.

(b) *River Landing Drive (Counts 5 and 6)*. On March 5, 2004, the residents of a home on River Landing Drive, two adults and their young child, were asleep in the master bedroom when they were awakened by five masked men carrying guns. The men, who were speaking in Spanish, asked for money. They took the two adults to

3

another bedroom and tied their hands and feet with shoelaces. The men took cash, a bracelet, a rosary, and a watch, among other items.

(c) *Glenwhite Drive (Counts 7 and 8).* In the early morning of March 29, 2004, several masked men invaded a home on Glenwhite Drive. One of the residents had arrived home from a nightclub and was preparing to go to bed when several men entered his room in the basement of the house. The men pointed a gun at him and told him to get on the floor. They tied the resident's hands behind his back with an electrical cord and took $300 from his pocket. Other residents were also tied up and moved to the basement, and the home invaders then ransacked the house. The men took $4,000 from under a mattress in one of the bedrooms. They also took a truck that was parked outside the house. According to a responding police officer, the victims described the suspects as five Spanish-speaking males armed with semiautomatic pistols.

(d) *Sandune Drive (Counts 9 through 10).* On April 9, 2004, six individuals shared a house on Sandune Drive. One of the residents fell asleep on the living room sofa; he awoke to find a gun pressed against his head. The resident saw that the men in the room wore masks, but he was not sure how many there were as he was placed face down on the floor. The men, who were speaking in Spanish, bound the resident

4

with tape and took $2,000 from his pocket. One of the gunmen guarded the first victim while the others went upstairs and robbed the other occupants. The assailants also took a truck parked outside the house. Before they left, one of the gunmen shot the first victim in the leg.

(e) *Skyview Lane and Shadowood Road (Counts 12 through 16)*. In the early morning of April 18, 2004, masked gunmen broke into a home on Skyview Lane. The men tied up the residents, two children, their mother, and her husband, with shoelaces. Some of the intruders spoke in English and others in Spanish. The husband recalled that four men initially entered the home, but that more arrived later. The intruders took credit cards, gold, chains, and $2,600, among other items. After the robbery, the family's GMC Jimmy truck was missing.

The men knew the mother's name, and they threatened to kill her children if she did not give them the money. One of the intruders pulled down her panties and touched her breasts, her body, and her legs. They then asked her where her sister lived. The men informed her that she would take them to her sister's house, which was located in the same mobile home park community. After she was untied and allowed to redress, four men took her to their car, and others remained behind with her two children and her husband.

5

The gunmen drove to the house on Shadowood Road where the mother's sister resided, and they directed her to knock on the door. When her brother-in-law opened the door, the gunmen forced their way inside. They again tied up the mother, along with her sister, her brother-in-law, and her nephew. The intruders took a consulate identification card, a watch, a bracelet, and $200 from the sister, among other items. After one of the men tortured the brother-in-law with a heated knife and threatened to cut off his son's fingers, he disclosed that he kept some cash in a shoe. The intruders took the money and left.

(f) *Appian Way (Counts 18 and 19).* After the robbery at Shadowood Road, the residents of that home moved to a house on Appian Way. On April 27, 2004, the family was asleep when the husband heard someone hit the door. The husband grabbed a gun, ran outside, and shot twice. The individuals outside, who had been trying to knock the door down with a metal bar, ran away.

(g) *Davenport Park Lane (Counts 22 and 23).* In the early morning of April 30, 2004, a resident of a home on Davenport Park Lane awoke to find a masked gunman in his bedroom. The resident snatched at the gunman's weapon. The intruder fired approximately ten times, and five bullets hit the resident. The resident's daughter

reported that two other men had been in her bedroom. The men left the house without taking anything.

(h) *The investigation and trial.* Also during the early morning hours of April 30, 2004, a Gwinnett County resident whose home was a short distance from the home invasion on Davenport Park Lane noticed a car with an "after-market exhaust" repeatedly driving through the neighborhood. Police responded to the resident's report of a suspicious vehicle, stopped the car, and placed the occupant, Jamie Carrera-Carmago, under arrest for driving without a driver's license. The arresting officers found a pistol and an uzi-type automatic weapon in the car.

After Carrera-Carmago was in custody, he was interviewed by police in connection with the series of armed robberies. Based upon the information provided by Carrera-Carmago, police set up surveillance at the Willow Trail and Clairmont Springs apartment complexes. Police arrested Cisneros shortly after he got into a vehicle which left the Clairmont Springs apartments. During an inventory search of the vehicle, officers recovered a pair of gloves, "a mask or cap balled up," and an empty holster.

Following his arrest on April 30, 2004, officers interviewed Cisneros at their Gwinnett County headquarters. During the first interview, Cisneros volunteered that

7

he was aware of the incidents where a man had been shot and where a man had been burned with a knife, but he maintained that he had been in Mexico for the previous two months and had just recently returned. He did not admit participating in any home invasions. Also on April 30, 2004, another officer conducted a second interview of Cisneros, during which he acknowledged having transported people to the "trailer park," although he changed his story in the course of an interview to having followed people to the trailer park.

Police executed a search warrant for the apartment at the Willow Trail apartment complex that had been identified by Carrera-Carmago. Officers found, among other items, electronic equipment, such as DVD's and monitors; clothing, including three ski masks; and a blue pouch containing numerous items of jewelry, a necklace, earrings, and a watch. At trial, victims of the Oakland Walk and River Landing home invasions identified items found in the blue pouch as having been taken from them during the robberies. Police also executed a search warrant at the Clairmont Springs apartment, where they found a large number of guns, jewelry, cash, and several ski masks.

Jose Martinez, one of Cisneros's co-indictees, testified for the State at trial. According to Martinez, he and Cisneros were both "driver[s]" for the Davenport Lane

8

home invasion. After the robbery, everyone returned to the Clairmont Springs apartment residence of Gonzalo Ortega, another co-indictee. Martinez further testified that he and Cisneros acted as the drivers for the group when they robbed the residents of the mobile homes on Skyview Lane and Shadowood Road. Martinez was also involved in the attempted home invasion at Appian Way. However, according to Martinez, Cisneros was not present at the Appian Way incident. Martinez further testified that he was a driver for the Glenwhite Drive robbery. Martinez maintained that Cisneros was not involved in the robbery on Glenwhite Drive. Martinez did not participate in the robbery at Sandune Drive, according to his testimony.

Ortega also testified for the State. According to Ortega, he and a co-worker were asked by Cisneros and Martinez to participate in the Sandune Drive robbery. He later met with Cisneros and Martinez, and the other co-indictees, to plan the crime. Ortega maintained that he acted as a "lookout" for the group, who bought duct tape and some ski masks at a convenience store before the robbery. They wore all black and carried, according to Ortega, a "book bag" full of weapons. After the robbery everyone, including Cisneros, went to a motel and split the money.

Ortega also testified that he initially acted as a lookout in the robberies of the two mobile homes. According to Ortega, everyone listed in the indictment was there,

9

including Cisneros, who also acted as a lookout. The plan was to rob one location. After the robbery had commenced, Ortega received a call that there was more money at another house. Cisneros picked up Ortega and they drove to the Skyview Lane residence. One of the co-indictees brought the victim out, and the three men, along with a fourth man unknown to Ortega, took her to the Shadowood Road residence, where they had the victim knock on the door. Ortega testified that after the door was opened, the four men then entered the home and took money. Everyone then went back to the Clairmont Springs apartment and divided the cash.

Ortega further testified that he and Cisneros, along with the other listed in the indictment, participated in the Davenport Park Lane robbery. According to Ortega, he was one of the men that went inside the residence, and Cisneros served as a lookout. Ortega testified that "something went wrong" and he shot the victim. Ortega also maintained that he and Cisneros, along with the other co-indictees, were involved in the Glenwhite Drive robbery.

Ortega further testified that he and the others conducting the home invasions were members of a gang, the "PL-14," and that Cisneros, as an older gang member, could give orders to Ortega. Cisneros, Martinez, and Silverio, according to Ortega, were obtaining information through "tips" as to whether there would be money at a

10

residence, and the location of the residence to be "hit" would come from one of the three. One of these three would always be present at the residence to be burglarized, and Ortega did not recall any instances where the person who gave the information to the group did not also go the location.

1. Cisneros contends that the evidence was insufficient to sustain his convictions on Counts 1 through 10, 14, 18, and 19 of the indictment.[8] In reviewing the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Punctuation and footnote omitted.) *Salazar v. State*, 326 Ga. App. 627, 627 (1) (757 SE2d 224) (2014). Further, "[t]he appellant no longer enjoys a presumption of innocence, and an appellate court determines only the legal sufficiency of the evidence and does not weigh the evidence or assess the credibility of the witnesses." (Punctuation and footnote omitted.) Id.

---

[8] Cisneros does not contest the sufficiency of the evidence to support his convictions for Counts 12, 13, 15, 16, 22, and 23, that is, the offenses arising out of the home invasions at Skyview Lane (other than Count 14, sexual battery, for which he maintains the evidence is not sufficient), Shadowood Road, and Davenport Park Lane.

11

(a) *Counts 1 through 4.* Cisneros was convicted of one count of burglary, one count of armed robbery, and two counts of aggravated sexual battery arising out of the Oakland Walk home invasion. Cisneros argues that the evidence was insufficient to support his convictions for these crimes. We agree.

The State acknowledges that no witness specifically identified Cisneros as a participant in the Oakland Walk robbery. The State contends that the evidence is nevertheless sufficient to support his convictions on Counts 1 through 4 because (i) Ortega testified that Cisneros told him that Cisneros had robbed additional locations, (ii) all of the home invasions involved a clear modus operandi, and (iii) items taken from the victims during the Oakland Walk robbery were found in the Willow Trail apartment where, the State maintains, Cisneros resided. See, e.g., *Berry v. State*, 274 Ga. App. 366, 369 (1) (618 SE2d 72) (2005) ("Once it is shown that goods were stolen in a burglary, absence of or unsatisfactory explanation of the possession of the goods will support a conviction for burglary based upon recent possession of the stolen goods.") (citations and punctuation omitted). The evidence showed that Cisneros admitted to Ortega, who maintained that he did not have personal knowledge of the home invasions that occurred before Sandune Drive, that "they had done this before." But Cisneros did not specify the time or locations of the other

12

crimes, and Ortega had no idea which residences were involved. The State bases Cisneros's connection to the Willow Trail apartment on a crime scene technician's testimony that he "was told that the apartment was occupied by the defendant."[9] The technician's testimony, however, was hearsay and, under the rules of evidence that applied at the time of Cisneros's 2008 trial, nonprobative even in the absence of an objection. See, e.g., *Lopez v. State*, 259 Ga. App. 720, 722 (2) (578 SE2d 304) (2003) (The officer's testimony that radio dispatch identified a pistol as stolen was nonprobative hearsay.); *Feagin v. State*, 198 Ga. App. 460, 461 (1) (402 SE2d 80) (1991) ("Hearsay evidence is without probative value and will not establish fact in issue even in the absence of a timely objection.") (citation and punctuation omitted).[10] The State also points to evidence that Cisneros did not live at Ortega's Clairmont

---

[9] On cross-examination, the technician said that he had been told by Keith Wiggins, a detective, that the Willow Trail apartment was the defendant's residence. The technician acknowledged that the identification of co-indictee Mario Silverio had been found in the apartment. As to who lived in the apartment, the technician testified: "I don't know. That's what I've been telling you. I don't know." Wiggins testified that Silverio's address was the Willow Trail apartment.

[10] By contrast, under our new Evidence Code, which became effective January 1, 2013: "Hearsay shall not be admissible except as provided by [OCGA §§ 24-8-801 through 24-8-807]; provided, however, that if a party does not properly object to hearsay, the objection shall be deemed waived, and the hearsay evidence shall be legal evidence and admissible." OCGA § 24-8-802.

13

Springs apartment, but it does not follow that this was evidence that Cisneros therefore lived at the Willow Trail apartment.

Without evidence showing that Cisneros had been in possession of the property taken at Oakland Walk, the circumstantial evidence is insufficient to support his convictions on Counts 1 through 4. As applicable here, "[t]o warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." OCGA § 24-4-6 (2008).[11] The modus operandi of the numerous home invasions, including the ones in which the evidence showed that Cisneros participated, were, as the State argues, markedly similar. The evidence authorized the jury to conclude that Cisneros participated in some of the home invasions committed by the group, as discussed infra, but the State does not point to any evidence from which a trier of fact could infer that, because Cisneros was associated with a gang that conducted home invasions, he participated in, or did otherwise aid, abet, advise, encourage, counsel, hire, or procure, every home invasion committed by the gang. Nor was there any evidence that Cisneros knew about the Oakland Walk home invasion or shared in the proceeds of the crime. See *James v.*

---

[11] This rule is also reflected in our new Evidence Code. See OCGA § 24-14-6.

14

*State*, 260 Ga. App. 350, 352 (1) (579 SE2d 750) (2003) (Although appellant, a gang leader, may have approved and rewarded criminal conduct by gang members generally, the evidence did not show he shared in the criminal intent to commit the particular crimes at issue). The evidence, which is entirely circumstantial as to Cisneros's participation in the Oakland Walk home invasion, did not exclude as a reasonable hypothesis that Cisneros did not participate in, or otherwise aid or abet, those particular offenses. See, e.g., *Parker v. State*, 297 Ga. App. 384, 385-387 (1) (677 SE2d 345) (2009) (Evidence that created a suspicion that appellant burglarized the barn did not exclude every other reasonable hypothesis.). A rational trier of fact could not conclude beyond a reasonable doubt that Cisneros was guilty of the crimes that occurred at Oakland Walk.

(b) *Counts 5 and 6.* We similarly conclude that the evidence was insufficient to support Cisneros's convictions for armed robbery and burglary in connection with the River Landing home invasion. Police found proceeds of the River Landing robbery in the Willow Trail apartment, and the State contends that this was sufficient to establish that Cisneros committed the crimes. The State did not show, however, as discussed in Division 1 (a), supra, that Cisneros resided in the Willow Trail apartment. Nor did the State show that Cisneros was in possession of the property

15

taken from River Landing. No witness identified Cisneros in connection with the River Landing home invasion.[12] Thus, the evidence did not exclude the reasonable possibility that Cisneros did not participate in the crimes committed at River Landing, or did not otherwise aid or abet the perpetrators of that crime, and the evidence is not sufficient to support Cisneros's convictions on Counts 5 and 6.

(c) *Counts 7 and 8.* Cisneros was convicted of burglary and armed robbery in connection with the Glenwhite Drive home invasion. Ortega testified that he was involved in the Glenwhite Drive incident, along with Cisneros and the other co-indictees.[13] Cisneros argues that the evidence was insufficient to support his convictions because no evidence independently corroborated Ortega's testimony.

> Former OCGA § 24-4-8, applicable at the time of [Cisneros's] trial, did
> require corroborating circumstances in a felony prosecution in which the

---

[12] A detective testified that he had identified Cisneros as a suspect in the River Landing robbery after determining that Cisneros had previously visited the residence. However, neither the victim who had alerted the investigator that two unknown men had visited his house with his brother-in-law, nor the victim's brother-in-law, who apparently knew Cisneros, testified at trial. The State does not contend that the detective's testimony placed Cisneros at the scene of the River Landing robbery.

[13] Martinez denied that Cisneros participated in the Glenwhite Drive home invasion, but it was for the jury to determine if, in that respect, his testimony was credible. See, e.g., *Vega v. State*, 285 Ga. 32, 33 (1) (673 SE2d 223) (2009) ("It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.") (citation and punctuation omitted).

only witness was an accomplice. Thus, the State had to present the testimony of at least one other witness or evidence of such corroborating circumstances; however, the required additional evidence could be circumstantial, slight, and in and of itself, insufficient to warrant a conviction of the charged crime. But, such independent evidence has to either directly connect the defendant with the crime or justify an inference that the defendant is guilty; it must corroborate the identity of the defendant and that the defendant participated in the crime.

(Citation and footnotes omitted.) *Lindsey v. State*, 295 Ga. 343, 347 (3) (760 SE2d 170) (2014).

Independently of Ortega, Cisneros was named by Martinez as a participant in the Davenport Park Lane, Skyview Lane, and Shadowood Road home invasions. The victims of those home invasions, as well as the victims of the Glenwhite Drive home invasion, described a markedly similar modus operandi in which, within a period of weeks and in the same county, multiple masked gunmen would storm the targeted home in the early morning hours, tie up the residents, and demand money. If the independent evidence was circumstantial and insufficient in itself to warrant Cisneros's conviction for the crimes at Glenwhite Drive, it was nevertheless sufficient to corroborate Ortega's testimony that Cisneros participated in the Glenwhite Drive home invasion. See *Bradford v. State*, 261 Ga. 833, 834 (1) (412 SE2d 534) (1992)

17

(The similarity between another crime in which appellant participated and the crime at issue gave rise to the inference that appellant participated in the crime at issue and was sufficient to corroborate the testimony of his accomplice.); *Martinez v. State*, 306 Ga. App. 512, 520-521 (1) (a), (d) (702 SE2d 747) (2010) (Given similarity between other crimes which appellant was shown to have committed and the offenses at issue, the evidence of appellant's participation in those crimes could be used to corroborate the accomplice's testimony that appellant participated in the crime at issue.); *Grimes v. State*, 291 Ga. App. 585, 589 (1) (662 SE2d 346) (2008) (Evidence corroborating accomplice's testimony that appellant was a party to the bank robbery committed by accomplice included evidence connecting appellant to a bank robbery employing the same modus operandi.); *McConnell v. State*, 166 Ga. App. 530, 531-532 (2) (304 SE2d 733) (1983) (Modus operandi of a series of burglaries constituted independent evidence corroborating accomplice's testimony.). Accordingly, the evidence was sufficient to support Cisneros's convictions on Count 7 and 8.

(d) *Counts 9 and 10.* Cisneros was convicted of armed robbery and burglary arising out of the home invasion on Sandune Drive. Ortega testified that he participated in that robbery, along with Cisneros and the other co-indictees. Cisneros argues that the evidence was insufficient to support his convictions because the

18

evidence did not corroborate Ortega's testimony. As with the crimes committed at Glenwhite Drive, evidence independent of Ortega's testimony showed that Cisneros participated in a series of home invasions employing the same modus operandi as the crimes committed at Sandune Drive. If not sufficient in and of itself to support his convictions, the independent evidence was sufficient to corroborate Ortega's testimony that Cisneros participated in the home invasion at Sandune Drive. See *Bradford v. State*, 261 Ga. at 834 (1); *Martinez v. State*, 306 Ga. App. at 512, 520 (1) (a); *Grimes v. State*, 291 Ga. App. at 589 (1); *McConnell v. State*, 166 Ga. App. at 531-532 (2). Accordingly, the evidence was sufficient to support Cisneros's convictions on Counts 9 and 10.

(e) *Count 14.* Cisneros was convicted of two counts of burglary, two counts of armed robbery, and one count of sexual battery arising out of the Skyview Lane and Shadowood Road home invasions on April 18, 2004. Cisneros does not contest the sufficiency of the evidence to support his burglary and armed robbery convictions, but he contends that the evidence was insufficient to support his conviction for sexual battery. The victim of the sexual battery was in her home in Skyview Lane when one of the intruders pulled down her panties and touched her breasts and other parts of her body. This is the same victim that Cisneros, who had initially been acting as a driver

19

or lookout for the group, later transported to Shadowood Lane. Cisneros argues that he could not have committed the sexual battery because the evidence shows without dispute that he was not the man who molested the victim. Nor, he argues, was he a party to that crime inasmuch as there is a lack of evidence that he possessed an intent to have the victim sexually battered.

We agree with Cisneros to the extent that it cannot be discerned from the evidence that he was the individual that personally molested the victim. We disagree that he was not a party to that crime. "All of the participants in a plan to rob are criminally responsible for the acts of each, committed in the execution of the plan, and which may be said to be a probable consequence of the unlawful design, even though the particular act may not have actually been a part of the plan." (Citations omitted.) *Lobdell v. State*, 256 Ga. 769, 773 (7) (353 SE2d 799) (1987). See OCGA § 16-2-20 (a) ("Every person concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of the crime."). Here, a trier of fact could conclude that the perpetrators' criminal design was not only to commit burglary and armed robbery, but to threaten, intimidate, and abuse the victims in the process. If the participants did not plan every indignity to be imposed on their victims, the jury could reasonably conclude that sexual battery was a probable

20

consequence of what Cisneros and the others intended to be a brutal home invasion. See *Short v. State*, 276 Ga. App. 340, 344 (1) (b) (623 SE2d 195) (2005) ("[A] jury could reasonably conclude that sexual assault was a probable consequence of the conspiracy to kidnap the female victim at gunpoint and drive around with her in a vehicle."). Accordingly, the evidence was sufficient to support Cisneros's conviction for sexual battery. See *Lobdell v. State*, 256 Ga. at 773 (7).

(f) *Counts 18 and 19.* Cisneros was convicted of burglary and attempted armed robbery arising out of the aborted home invasion on Appian Way. No one identified Cisneros as being present at that incident. According to Martinez, he and others went to Appian Way, but Cisneros was not there. The State contends that the evidence was sufficient to show that Cisneros was a party to the crime because he was one of the members of the group that targeted residences for burglary and planned the crimes, and because the victims in the Appian Way incident were the same victims that had been robbed by Cisneros at Shadowood Road. In particular, the State points to Ortega's testimony that the individuals conducting the home invasions were members of a gang, that Cisneros was one of the gang members who gave orders, and that Cisneros was one of the gang members who had identified locations to be robbed.

21

If a person does not directly commit the crime, he may be convicted as a party to the crime "if he . . . [i]ntentionally aids or abets in the commission of the crime; or . . . [i]ntentionally advises, encourages, hires, counsels, or procures another to commit the crime." OCGA § 16-2-20 (b) (3), (4). "Proof that the defendant shares a common criminal intent with the actual perpetrators is necessary and may be inferred from the defendant's conduct before, during, and after the crime." (Citations omitted.) *Eckman v. State*, 274 Ga. 63, 65 (1) (548 SE2d 310) (2001). Here, there is no direct evidence that Cisneros participated in any manner in the crimes at Appian Way, either in person or by selecting Appian Way as a target or by planning the crime, or that he knew the group planned to burglarize Appian Way and shared their intent. Compare *Greene v. State*, 257 Ga. App. 837, 840 (3) (572 SE2d 382) (2002) (evidence was sufficient to support appellant's conviction as a party to the crime because, although appellant was not present at the commission of the crime by the group, beforehand he was privy to discussions about the crime and the others in the group requested his participation; afterwards, the defendant asked if he could still get money from the robbery, he met with others in the group to discuss the crime, and he then drove them around in search of an insider involved in the crime). Nor does circumstantial evidence exclude the reasonable possibility that someone other than Cisneros selected

22

and planned the crime, and that Cisneros did not aid, abet, advise, encourage, counsel, hire, or procure the perpetrators in their commission of the crimes at Appian Way. See *James v. State*, 260 Ga. App. at 352 (1). Accordingly, we cannot conclude that the evidence was sufficient for a rational trier of fact to find beyond a reasonable doubt that Cisneros was guilty of Counts 18 and 19.

In summary, as to those convictions for which Cisneros contests the sufficiency of the evidence, we conclude that the evidence was not sufficient to support Cisneros's convictions for Counts 1, 2, 3, 4, 5, 6, 18, and 19. The evidence was sufficient to support Cisneros's convictions on Counts 7, 8, 9, 10, and 14.

2. Cisneros contends that his trial counsel was ineffective in failing to challenge the courtroom interpreter's interpretation and by failing to require the trial court to follow the Georgia Supreme Court's guidelines regarding challenged interpretations. In order to prevail on his claim of ineffective assistance, Cisneros

> must show counsel's performance was deficient and that the deficient performance prejudiced [him] to the point that a reasonable probability exists that, but for counsel's errors, the outcome of the trial would have been different. A strong presumption exists that counsel's conduct falls within the broad range of professional conduct. If a defendant fails to meet [his] burden on one prong of the two-prong test, then the other prong need not be reviewed by the Court.

(Citations and punctuation omitted.) *Powell v. State*, 297 Ga. 352, 356 (5) (773 SE2d 762) (2015).

During the third day of the trial, the court's interpreter stated during a bench conference that, "I don't know if Your Honor [has] been noticing, but we've got the Colombian woman on the jury, she is shouting out words to the interpretation." After excusing the jury, the prosecutor commented that the second alternate juror, M. B., "has made a couple of different times sort of an outburst basically translating the word. I mean she says the word in English when [the interpreter] has asked the witness to clarify." The trial court asked a bailiff to instruct M. B. to "refrain from shouting out" during the course of the proceedings.

After the close of evidence, the trial court told M. B. that the court had been "made aware" that the juror had been expressing her thoughts "about this case and the resolution of this case" to the other jurors. Upon questioning by the prosecutor and the defense attorney, M. B. denied having commented about the case or about the defendant. She acknowledged, however, that she made "comments about the words" and that she had explained to other jurors why it required "a lot words in Spanish" to express a thought.

The trial court brought in the other jurors for questioning.

24

One of the jurors reported that M. B. had made comments about the interpretation to the other jurors. Another said that M. B. "told everybody that she could not give a guilty verdict because she couldn't live with herself for the rest of her life if she did that." After questioning the jurors, the prosecutor and defense counsel agreed that M. B. be dismissed. Cisneros's trial counsel then moved for a mistrial and argued that the jury had been tainted because M. B. had provided an ongoing separate interpretation to the other jurors. After the motion for mistrial, the trial court questioned the jurors a second time, and all but two said that they had heard M. B. criticizing, critiquing, or correcting the translation from the jury stand. All the jurors that heard M. B.'s comments said that they would set them aside and follow the translation from the jury stand. The trial court then denied the motion for mistrial.

Cisneros argues that his trial counsel was deficient in failing to object to the courtroom interpreter's interpretation because, given M. B.'s comments, he was on notice by the third day of the two-week trial that there was a problem with the interpretation, and, he asserts, his counsel's failure to object at any point in the proceedings waived Cisneros's opportunity to challenge the interpretation. See *Baldivia v. State*, 267 Ga. App. 266, 272 (3) (599 SE2d 188) (2004) (Appellant's claim that the court-provided interpreter failed to translate effectively for him was

25

waived by his failure to pose a timely objection to the interpretation). Cisneros claims that he was prejudiced by his trial counsel's performance in that the majority of the victim and co-indictee testimony was made through the courtroom interpreter, and expert testimony during the hearing for motion for new trial showed that the courtroom interpreter made numerous specific errors and, the expert testified, "inserted meaning with the errors that she made, consistently because of proficiency problems," which errors "statistically [affected] the defense more, much more than the prosecution." Compare generally *Choi v. State*, 269 Ga. 376, 377 (3) (497 SE2d 563) (1998) (Where the trial court did not abuse its discretion in finding interpreter to be qualified, and appellant "has not pointed to any specific errors made in the interpretation that harmed him," there was no error in trial court's overruling of appellant's objection to the interpreter.).

The interpreter in question is Allison Epps, who provided the courtroom interpretation of and for the Spanish-speaking witnesses. A second interpreter, Katherine Murillo-Brueck, sat at the defense table and interpreted the proceedings into Spanish for Cisneros. Trial counsel did not speak Spanish. His counsel testified that Cisneros also spoke English, that he communicated with Cisneros in English, and that, to his knowledge, Cisneros had no difficulty with English.

26

Cisneros points to nothing that should have caused his trial counsel to object to the courtroom interpretation. First, Cisneros does not show that his trial counsel had any reason to doubt Epps's professional qualifications. Epps's testimony at the motion for new trial hearing showed that she has a master's degree in Bilingual Legal Interpreting and that she is, and was at the time of Cisneros's trial, a court certified interpreter. Further, according to trial counsel, in his experience if a client, as in this case, spoke English, the client would generally bring a problem with courtroom interpretation to his attention. Counsel did not recall that Cisneros ever said to him that there was a problem with the interpretation. According to trial counsel, "there was nothing to indicate to me that there was an issue."

Counsel testified that he also relied on Murillo-Brueck, who "had sat [with him] . . . in murder trials," to alert him if anything was wrong with the courtroom interpretation. Although, as Cisneros points out, Murillo-Brueck was acting for the court and not as an advocate for the defense, Murillo-Brueck, a court certified interpreter, testified at the hearing on motion for new trial that it was her professional and ethical duty to alert the courtroom interpreter to translation errors "that could affect the case." As to this trial, Murillo-Brueck recalled raising a translation issue with Epps, which Epps then corrected and brought to the court's attention. According

to Murillo-Brueck, during the trial she had been "able to hear the witness's testimony and Ms. Epps's interpretation fully." Even if trial counsel could not have expected Murillo-Brueck to report any translation errors made by Epps directly to him, it was nevertheless reasonable for trial counsel to take into account the presence and actions of a second court certified interpreter in assessing whether he had reason to doubt the accuracy of Epps's translations.

As to M. B., trial counsel testified that he did not know "at that time if [M. B.] was that good of a Spanish speaker or not. Or whether she was just . . . conversational[,] [and] nothing indicated to [him] what her . . . interpreting skills were." Cisneros does not show that his counsel had any basis to doubt the interpretation provided by Epps because of what M. B. said during the course of the trial or upon her voir dire following the close of evidence. Trial counsel did have reason to suspect that the jury had been tainted because M. B. had provided her own interpretation for the other jurors, and he moved for a mistrial on that ground. But we cannot discern any basis for a valid objection to the interpretation provided by the court certified interpreter on the ground that M. B. was in apparent disagreement with portions of that interpretation.

Nor can we conclude that trial counsel acted unreasonably in failing to insist on a hearing under the Supreme Court of Georgia's Rules for the Use of Interpreters (the "Rules"). The Rules provide for such a procedure "[w]here a challenge is made to the accuracy of a translation[.]"[14] Cisneros maintains that M. B. had challenged the accuracy of the courtroom translation during the trial and then during the hearing on her misconduct, and that trial counsel "merely needed to insist that the trial court follow" the Rules. Although the Rules do not specify how the accuracy of a translation may be challenged, or who may make such a challenge, the Rules do not reasonably contemplate that a hearing must be held where a juror is making comments from the jury stand and complaining to other jurors about the translation, as occurred here. Further, under the Rules the trial court "shall resolve the issue of the contested translation," so long as the trial court has "first determine[d] whether the

---

[14] Section VII (A) (1) of the Rules provide, in pertinent part:
Where a challenge is made to the accuracy of a translation, the court shall first determine whether the interpreter is able to communicate accurately with and translate information to and from the non-English speaking person. If it is determined that the interpreter cannot perform these functions, arrangements for another interpreter should be made, unless testimony that is cumulative, irrelevant, or immaterial is involved. Where the court determines that the interpreter has the ability to communicate effectively with the non-English speaker, the court shall resolve the issue of the contested translation and the record to be made of the contested testimony in its discretion.

29

interpreter is able to communicate accurately with and translate information to and from the non-English speaking person." Nothing put trial counsel on notice that Epps was not *able* to perform her duties as an interpreter, and his failure to insist on a hearing on that issue was reasonable. And Cisneros does not point to any specific portion of the courtroom translation that was brought to either trial counsel's or the court's attention as then being in dispute and therefore resolvable by the trial court. In view of the foregoing, Cisneros does not show that his trial counsel's performance was professionally deficient in failing to object to Epps's interpretation or to insist on a hearing under the Rules, and the trial court did not err in rejecting his claim of ineffective assistance.

*Judgment affirmed in part and reversed in part. McFadden, J., concurs, and Dillard, J., concurs in judgment only.*

A15A1257. CISNEROS v. THE STATE.                                    DI-044C

DILLARD, Judge, concurring in judgment only.

I concur in judgment only because I do not agree with all that is said in the majority opinion. As a result, the majority's opinion decides only the issues presented in the case sub judice and may not be cited as binding precedent. See Court of Appeals Rule 33 (a).