## S16G0443. CISNEROS v. THE STATE.
(792 SE2d 326)

THOMPSON, Chief Justice.

In 2004, appellant Gustavo Cisneros was indicted, along with eight others, for crimes related to a series of home invasions in Gwinnett County, Georgia. In 2008, following a separate jury trial at which two of his co-indictees testified, appellant was found guilty of six counts of armed robbery, eight counts of burglary, two counts of criminal attempt to commit armed robbery, two counts of aggravated sexual battery, and one count of sexual battery. His convictions were affirmed in part and reversed in part on appeal to the Court of Appeals.[1] See Cisneros v. State, 334 Ga. App. 659, 659 (780 SE2d 360) (2015). We granted his petition for writ of certiorari to consider the following issues:

> (1) Did the Court of Appeals err in concluding in Division 1 (c) and (d) of its opinion that modus operandi evidence alone was sufficient to corroborate an accomplice's testimony such that the evidence presented at trial was sufficient to support the defendant's convictions for burglary and armed robbery?
>
> (2) Did the Court of Appeals err in concluding in Division 1 (e) of its opinion that the evidence presented at trial was sufficient to sustain the conviction of the defendant as a party to the crime of sexual battery?
>
> (3) Did the Court of Appeals err in concluding in Division 2 of its opinion that trial counsel was not ineffective for failing to object during trial to the Spanish translation being done by a courtroom interpreter, or for failing to insist on a hearing under Section VII (A) (1) of the Supreme Court of Georgia's Rules for the Use of Interpreters?

For the reasons that follow, we affirm the decision of the Court of Appeals.

1. The first issue that we asked the parties to address concerns the sufficiency of the evidence to support appellant's convictions for armed robbery and burglary relating to home invasions on Glenwhite Drive (Counts 7 and 8) and Sandune Drive (Counts 9 and 10). See Cisneros, 334 Ga. App. at 666-668 (1) (c), (d). The only witness against appellant for those crimes was an accomplice, Gonzalo Ortega. The

---

[1] The Court of Appeals reversed eight of appellant's convictions related to three home invasions because it found the evidence of appellant's involvement in those crimes was insufficient to convict.

Court of Appeals held that Ortega's testimony was sufficiently corroborated by evidence at trial showing that appellant was a participant in home invasions on Davenport Park Lane, Skyview Lane, and Shadowood Road. Appellant was convicted of crimes related to those home invasions and did not challenge the sufficiency of the evidence for those convictions on appeal. The Court of Appeals held that all five home invasions had a "markedly similar modus operandi" and held that this modus operandi was sufficient by itself to corroborate Ortega's testimony. See id. For the reasons that follow, we affirm the decision of the Court of Appeals.

(a) To begin, it is necessary to review the facts presented at trial regarding the relevant home invasions. Viewing the evidence in the light most favorable to the verdicts, see *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979), the record shows that on March 29, 2004, several men entered a residence on Glenwhite Drive in the early morning hours. The men, armed with handguns and wearing face-covering masks or bandanas, pointed a gun at one victim and told him to get on the floor and not to look at them. They tied that victim's hands behind his back with a cable wire and stole $300 from his pocket, then left one gunman to guard him while the others spent several hours ransacking the house. Other victims were awakened with guns pointed at their heads and were told to get up, lie on the floor, and not look at anyone. They were then tied with their hands behind their backs. The gunmen demanded money and drugs and eventually took all of the victims to the basement where the first victim was being held. The gunmen, whom the victims described as males who spoke both Spanish and English, also took a pickup truck that was parked in front of the home.

Appellant's convictions for robbery and burglary in Counts 9-10 arose out of a home invasion that occurred on April 9, 2004, on Sandune Drive. The evidence regarding those charges showed a victim fell asleep on his couch and woke up with a gun pressed against his head. His assailants, whom he described as six Spanish and English speaking men who wore black ski masks, placed him face down on the floor. The gunmen tied his hands behind his back with duct tape and took money from his pockets. One gunman then guarded the first victim while others went upstairs and robbed the other residents. Eventually, all of the victims were brought to one room and held under guard after being ordered to lie face down on the floor. The gunmen demanded the victims' wallets, and when they discovered one victim did not turn over his wallet, they repeatedly kicked him in the head. Another victim was shot in the upper thigh. One victim testified he had recently been paid as a subcontractor on a construction project and had $2,000 in cash taken from his pocket,

as well as a large sum of money he kept in his closet. He stated the intruders knew he had just been paid and knew who they (the victims) were, going so far as to check the victims' wallets to confirm their identities and noting that at least one person the gunmen expected to be at that location was not present. The gunmen took money, jewelry, clothing, and a truck that was parked outside the home.

The record shows with regard to the Skyview Lane and Shadowood Road crimes that in the early morning hours of April 18, 2004, masked gunmen broke into a home on Skyview Lane in which a mother, father, and two children were residing. The gunmen placed guns to the victims' heads and ordered them to lie face down and to either keep their heads down or not to look at the gunmen. The father was taken to a separate room where the gunmen tied his hands behind his back with shoelaces and ordered him to lie face down on the floor. The other victims were similarly tied with their hands behind their backs. The gunmen demanded money, credit cards, and PIN numbers. The child victims were then placed in the same room while gunmen ransacked the house, taking credit cards, jewelry, and $2,600 in cash, as well as a computer game system. They also stole the family's GMC Jimmy truck that was parked in front of their home. The victims testified that some of the gunmen spoke English while others spoke Spanish, that they wore ski masks and gloves, and that they stayed in the home for several hours.

The mother testified that the gunmen called her by name and asked her to confirm her identity. They told her they knew she had money from her recent sale of a car and threatened to kill her children if she did not give them the money. While gunmen ransacked the house, she was kept separate from the other victims. During this time, one gunman pulled down her underpants and touched her breasts, her body, and her legs.

After a period of time, the gunmen asked the mother where her sister lived. While some of the gunmen stayed with her husband and children in her home, she testified that four gunmen drove her to her sister's house on Shadowood Road and directed her to knock on the door. When her brother-in-law opened the door, the gunmen forced their way inside. They again tied up the mother, along with her sister, her brother-in-law, and her nephew, put all of the victims in the same room, ordered them on the floor, and demanded money and drugs. After one of the gunmen tortured the brother-in-law by burning his bare back with a heated knife and threatened to cut off his son's fingers, the brother-in-law told the gunmen that he kept cash in a shoe in a closet. The gunmen searched the entire home, eventually taking from the home, among other things, an identification card, jewelry, and money.

Jose Martinez, a co-indictee, testified for the State at trial. He told the jury he and appellant were drivers for the Skyview Lane and Shadowood Road robberies but that appellant did not participate in the Glenwhite Drive robbery. He also stated generally that co-indictee Mario Silverio supplied the weapons and decided whom the group would rob.

Co-indictee Gonzalo Ortega also testified as a witness for the State, telling jurors that he, appellant, and the other co-indictees were all involved in the Glenwhite Drive robbery. He also described how appellant asked him and a co-worker to participate in the Sandune Drive robbery, how they planned that armed robbery, and how, just before those crimes, the group stopped at a convenience store where they bought duct tape and ski masks. Ortega stated he acted as a lookout while the other men went inside the home. After the robbery, he asserted, all of the men met at a hotel where they divided the money they had taken. He also testified that everyone listed in the indictment, including appellant, participated in the Skyview Lane robbery. He explained how he and appellant originally acted as drivers and lookouts, but after the others called and said there was more money at another location, they returned to the Skyview Lane address. From there, Ortega, appellant, and two others drove the mother to her sister's Shadowood Road address, stood to the side while she knocked on the door, and when the brother-in-law opened the door, pushed their way inside. Consistent with the victims' testimony, Ortega admitted they took money from the victims and later divided the proceeds among everyone involved, including appellant. Ortega testified generally that appellant, Martinez, and another co-indictee would get information about someone they believed had a large amount of cash, thus identifying their intended victim, and after the planned robbery, each member of the group would receive a portion of the proceeds even if they did not directly participate in the robbery.

(b) Appellant contends the Court of Appeals erred by holding that the modus operandi evidence was, by itself, sufficient to corroborate Ortega's testimony regarding the Glenwhite Drive and Sandune Drive home invasions. Former OCGA § 24-4-8, applicable at the time of appellant's trial, provided, with only a few exceptions not applicable here, that a defendant may not be convicted of a felony based on the uncorroborated testimony of an accomplice.[2] Thus, in order to

---

[2] This provision was carried forward in the new Evidence Code as OCGA § 24-14-8, and we have given the new provision the same meaning as the old one. See *Bradshaw v. State*, 296 Ga. 650, 654 (769 SE2d 892) (2015).

sustain appellant's convictions for the armed robberies and burglaries that occurred at the Glenwhite Drive and Sandune Drive locations, the State was required to present evidence of

> corroborating facts or circumstances, which, in themselves and independently of the testimony of the accomplice, directly [connected appellant] with the crime, or [led] to the inference that he [was] guilty, and [was] more than sufficient to merely cast on [appellant] a grave suspicion of guilt.

(Citations and punctuation omitted.) *Bradford*, 261 Ga. at 834. Slight evidence of corroboration is all that is needed to support a guilty verdict, and "the necessary corroboration may consist entirely of circumstantial evidence, and evidence of the defendant's conduct before and after the crime was committed may give rise to an inference that he participated in the crime." (Citations and punctuation omitted.) Id. "After the State provides such evidence, it is for the jury to determine whether the evidence sufficiently corroborates the accomplice's testimony and warrants the sought conviction." (Citation omitted). *Lindsey v. State*, 295 Ga. 343, 347 (760 SE2d 170) (2014).

As stated, appellant was convicted of armed robbery and burglary arising out of the home invasions at both the Glenwhite Drive and Sandune Drive locations. He was also convicted of the robberies and burglaries that occurred at the Skyview Lane and Shadowood Road home invasions. Victims at each of these locations testified that in the early morning hours a group of armed, Spanish speaking men wearing dark clothing and face-covering masks entered their homes and pointed guns at their heads. The assailants told the victims not to look at them and demanded money, indicating they knew the victims were in possession of a large amount of cash. They ordered the victims to lie face down and tied them with their hands behind their backs. In each case, the assailants first kept the victims separate from each other but subsequently placed them together, under guard, while the gunmen spent several hours ransacking the home, taking primarily money and jewelry but also a vehicle belonging to one of the victims. Moreover, all four home invasions occurred over the course of only three weeks and were committed within the same county. We conclude the modus operandi evidence in this case was sufficient to corroborate Ortega's testimony identifying appellant as a participant in the Glenwhite Drive and Sandune Drive crimes.[3] See *Veal v. State*,

---

[3] Having determined that the modus operandi of these four home invasions was sufficient to corroborate Ortega's testimony, we need not determine whether the modus operandi of the

298 Ga. 691, 694-695 (2) (784 SE2d 403) (2016). See also *Brannon v. State*, 298 Ga. 601 (4) (783 SE2d 642) (2016) (holding that evidence showing defendant and same co-defendant, within a 13-day period and in neighboring counties, stole a car with distinctive tire rims after shooting the vehicle's owner showed a sufficiently similar modus operandi as to warrant its admission in evidence to prove identity under OCGA § 24-4-404 (b)). Accordingly, there was sufficient evidence to support the jury's verdicts related to the Glenwhite Drive and Sandune Drive crimes (Counts 7-10), and the Court of Appeals did not err by affirming these convictions.

2. The second issue the parties were asked to address was whether the Court of Appeals erred when it determined that the evidence presented at trial was sufficient to sustain appellant's conviction as a party to the crime of sexual battery, a crime which occurred during the Skyview Lane home invasion. Although the State's theory was that appellant was guilty of this charge as a party to the crime, see OCGA § 16-2-20 (b), appellant argues the evidence was insufficient to support the jury's verdict of guilt because there was no evidence showing he knew a sexual battery would occur or that he intentionally aided and abetted any part of that crime.

> When evaluating the sufficiency of evidence, the proper standard for review is whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. This Court does not reweigh evidence or resolve conflicts in testimony; instead, evidence is reviewed in a light most favorable to the verdict, with deference to the jury's assessment of the weight and credibility of the evidence.

(Citations omitted.) *Mickens v. State*, 277 Ga. 627, 627-628 (593 SE2d 350) (2004).

OCGA § 16-6-22.1 (b) defines the offense of sexual battery as "intentional[ ] . . . physical contact with the intimate parts of the body of another person without the consent of that person." A person who does not directly commit a crime may nevertheless be convicted as a party to that crime upon proof that he or she intentionally aided or abetted the commission of the crime, or intentionally advised, encouraged, hired, counseled, or procured another to commit the crime. See OCGA § 16-2-20 (b) (3), (4). "All of the participants in a plan to [commit a crime] are criminally responsible for the acts of each,

---

Davenport Park Lane home invasion, which was quickly thwarted when the victim grabbed an assailant's gun, was sufficiently similar.

committed in the execution of the plan, and which may be said to be a probable consequence of the unlawful design, even though the particular act may not have actually been a part of the plan." *Lobdell v. State*, 256 Ga. 769, 773 (7) (353 SE2d 799) (1987). See OCGA § 16-2-20 (a) ("Every person concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of the crime."); *Hill v. State*, 297 Ga. 675 (777 SE2d 460) (2015) (affirming defendant's conviction for felony murder as a party to the crime because death of his accomplice was a reasonably foreseeable result of their commission of a felony). "Whether a person is a party to a crime may be inferred from that person's presence, companionship, and conduct before, during, and after the crime." (Citations and punctuation omitted.) *Harper v. State*, 298 Ga. 158, 160 (780 SE2d 308) (2015).

Here, evidence was presented establishing that appellant, together with several co-indictees, planned and executed the armed robbery and burglary at Skyview Lane, that appellant acted as a driver and lookout while the others directly participated in those crimes, and that one co-conspirator committed a sexual battery while in the victims' home. The evidence showed appellant and three other gunmen then drove the victim of the sexual battery at gunpoint to her sister's house. There, they committed another burglary and armed robbery and participated in the burning of a victim for the purpose of coercing him to tell them where he kept his money. The gunmen, including appellant, then divided the proceeds from both robberies. We agree with the Court of Appeals that from this evidence, as well as evidence of appellant's participation in and knowledge of the crimes discussed above and others for which he was convicted at trial, the jury was authorized to find that appellant knew his co-conspirators intended to commit a brutal home invasion at the Skyview Lane residence where they likely would use threats, intimidation, and physical coercion. See *Cisneros*, 334 Ga. App. at 668 (1) (e). The jury also would have been authorized to find that appellant was aware of the possibility that a co-conspirator might commit a sexual battery, which, by definition, does not require sexual contact with a victim's intimate body parts, but only "non-consensual, intentional physical contact with a victim's intimate body parts." *Watson v. State*, 297 Ga. 718, 720 (2) (777 SE2d 677) (2015). This possibility was especially foreseeable at the Skyview Lane robbery given that appellant had participated in previous robberies where the group had beaten and shot victims to force compliance with their demand for cash and other valuables. Based on this evidence, we find the evidence was sufficient

to authorize the jury to find appellant guilty of sexual battery as a party to the crime.[4] See *Jackson v. Virginia*, 443 U. S. 307.

Similar to the argument rejected by this Court in *Hicks v. State*, 295 Ga. 268 (759 SE2d 509) (2014), appellant contends the United States Supreme Court's decision in *Rosemond v. United States*, ___ U. S. ___ (134 SCt 1240, 188 LE2d 248) (2014), required the State to prove not merely that the commission of a sexual battery was reasonably foreseeable but that he had advance knowledge that a co-conspirator would commit this offense. We reiterate here our conclusion in *Hicks* that *Rosemond* "arose under federal law and thus does not control." *Hicks*, 295 Ga. at 273, n. 3. In addition, *Rosemond* did not address issues of due process as contended by appellant.

3. The final issue raised in this granted certiorari is whether the Court of Appeals erred by concluding that trial counsel was not ineffective for failing to object during trial to the courtroom interpreter's interpretation and failing to insist on a hearing to assess the accuracy of the interpretation. See *Strickland v. Washington*, 466 U. S. 668 (104 SCt 2052, 80 LE2d 674) (1984); Georgia Supreme Court Rules for the Use of Interpreters for Non-English Speaking and Hearing Impaired Persons, VII (A) (1), Record of Interpreter Testimony. Appellant contends counsel's performance was deficient on both of the asserted grounds and that he was prejudiced by counsel's deficient performance.

To prevail on his claim of ineffectiveness, appellant must show both that trial counsel's performance was deficient and that but for the deficiency, there is a reasonable probability that the outcome of his trial would have been different. *Strickland*, 466 U. S. at 687, 694; *Smith v. Francis*, 253 Ga. 782, 783 (325 SE2d 362) (1985). "This burden, although not impossible to carry, is a heavy one." *Young v. State*, 292 Ga. 443, 445 (3) (738 SE2d 575) (2013). "In the event appellant fails to satisfy either the deficient performance or prejudice prong of the *Strickland* test, this Court is not required to examine the other prong." (Citation and punctuation omitted.) *Rush v. State*, 294 Ga. 388, 390 (2) (754 SE2d 63) (2014). Pretermitting the question of whether trial counsel was deficient on the asserted grounds, we conclude appellant has not met his burden of proving prejudice.

The record establishes that the trial court appointed two interpreters to serve at trial. One, Katherine Murillo-Brucek, sat at the defense table to translate for appellant, and the other, Allison Epps,

---

[4] We find no authority, and appellant has cited none, for his suggestion that the commission of a sexual battery by a co-conspirator cannot be reasonably foreseeable because armed robbery, burglary, and sexual battery are separate crimes that do not merge for sentencing purposes.

was appointed as the courtroom interpreter tasked with translating counsels' questions to and the testimony of all Spanish speaking witnesses. On the third day of trial, Ms. Epps noted during a bench conference that the second alternate juror, Juror 14, had been shouting out words during the interpretation. The trial court asked the bailiff to instruct Juror 14 to refrain from commenting. After the close of evidence, the trial court informed Juror 14 that it was aware she had been expressing her thoughts about the case to other jurors. During questioning, Juror 14 denied making comments about the case or her intended verdict, but she admitted she had responded to one juror's question about the number of words used in Spanish translations, explaining more words may be required to express the same thought in Spanish.[5] The trial court then individually questioned jurors, learning from some that Juror 14 had stated she could not live with herself if she found appellant guilty and that a majority of the jurors had heard Juror 14 make comments critiquing or commenting on the interpreter's interpretation. Defense counsel's motion for a mistrial was denied by the trial court after further questioning of the jurors who all stated unequivocally that they could set aside Juror 14's comments and follow the official interpretation provided by the courtroom interpreter. The trial court then dismissed Juror 14 from service.

(a) Appellant first contends trial counsel was deficient for failing to object to the courtroom interpretation after its adequacy was called into question by Juror 14's comments. He asserts he was prejudiced by counsel's failure to object because expert testimony presented on motion for new trial demonstrated that the interpretation interfered with defense counsel's ability to present a defense and changed the meaning of the questions asked or answers given, thereby denying him a fair trial.

We recognized in *Ramos v. Terry*, 279 Ga. 889, 892 (1) (622 SE2d 339) (2005), that "[t]he use of qualified interpreters is necessary to preserve meaningful access to the legal system for persons who speak and understand only languages other than English. [Cit.]" We have also recognized that due process concerns are raised when the accuracy of an interpretation is in doubt. See *Puga-Cerantes v. State*, 281 Ga. 78, 80-81 (5) (635 SE2d 118) (2006). For this reason, when a challenge to an interpretation is raised, our inquiry is focused on whether the alleged inadequacies rendered the defendant's trial

---

[5] During voir dire, Juror 14 stated she worked at Home Depot as a customer service specialist where she communicated with people who spoke foreign languages. She claimed she spoke English, Italian, Portuguese, Spanish, and Hebrew.

fundamentally unfair. See *Ling v. State*, 288 Ga. 299, 300 (702 SE2d 881) (2010). See also *United States v. Joshi*, 896 F2d 1303, 1309 (11th Cir. 1990); *Valladares v. United States*, 871 F2d 1564, 1566 (11th Cir. 1989) (Powell, J.); *United States v. Tapia*, 631 F2d 1207, 1210 (5th Cir. 1980); Ga. Const. of 1983, Art. I, Sec. I, Par. I. That does not mean that a criminal defendant is constitutionally entitled to a perfect, word for word interpretation, something we would consider quite rare due to cultural differences, changes in dialect, and differences in interpreter proficiency. Rather, errors in interpretation must be considered in their full context and with respect to the entirety of the trial to determine how they may have affected a defendant's right to a fair trial. See *United States v. Long*, 301 F3d 1095, 1105 (9th Cir. 2002) ("occasional lapses in [word for word interpretation] will not necessarily contravene a defendant's constitutional rights"); *United States v. Gomez*, 908 F2d 809, 811 (11th Cir. 1990) (recognizing that "defendants have no constitutional 'right' to flawless, word for word translations"); *Joshi*, 896 F2d at 1309 (stating that "occasional lapses" from word to word translation will not render a trial "fundamentally unfair"); *Valladares*, 871 F2d at 1566. See also *State v. Mitjans*, 408 NW2d 824, 832 (Minn. 1987) ("Translation is an art more than a science, and there is no such thing as a perfect translation . . . . Indeed, in every case there will be room for disagreement among expert translators over some aspects of the translation."). Obviously, a defendant is denied a fair trial if interpretation errors significantly hinder his or her presentation of a defense or alter in a meaningful way the evidence submitted to the jury.

The only suggestion in the trial transcript that there was any issue with the courtroom interpretation was Juror 14's comments made during trial and in the presence of other jurors but which were not transcribed and made part of the record in this case. From other jurors, we know only that her comments were general criticisms to which jurors unequivocally agreed they paid little attention and would give no consideration in reaching their verdicts. On motion for new trial, appellant presented the testimony of his trial counsel, who testified that he did not speak Spanish, that appellant spoke English, and that both before and during trial he communicated with appellant in English without difficulty. Counsel also related that he previously had worked with both interpreters on lengthy criminal trials, and he had no reason to question their proficiency in the Spanish language or their ability to interpret.

Appellant also presented the testimony of Dr. Marianne Mason, a linguistics expert who, after reviewing the court reporter's audio recording and the official transcript, concluded that significant errors in translation occurred during trial. The bulk of appellant's challenge

is devoted to the identification of instances during trial where, he alleges, the interpreter's use of an alternate word or placement of a word in a sentence changed the question or statement. For example, witness Martinez, a co-indictee, was asked by the prosecutor, "What would you all do with the proceeds from each house?" Dr. Mason testified that this question was translated by the interpreter as "What do you all do with the things that you all took from the house?" and argued that the substitution of the word "things" for "proceeds" was significant because "proceeds" would "mean something beneficial" to the person being asked the question. Another allegation involves the testimony of a victim in the Glenwhite robbery who was asked, "What items were taken from the home that belonged to you?" The translation, according to Dr. Mason, was altered to ask, "What articles did *they* take from the house?" Appellant argues this change of wording was prejudicial because it focused the question on him as opposed to what items were taken by the intruders.

We conclude this evidence was insufficient to satisfy appellant's burden of establishing that the interpretation in this case was so inadequate as to deny him a fundamentally fair trial. Although the interpreter sometimes failed to provide word for word interpretations, had to seek clarification, paused, or made more than one attempt to accurately interpret counsels' questions or a witness' testimony, none of the alleged errors prevented appellant from effectively presenting his defense, and we find no instance where the meaning of a witness' testimony was altered in a legally significant manner.[6] While we have acknowledged that nuances of translation may, in some cases, provide an alternate but totally different meaning, see *Ramos*, 279 Ga. at 892, n. 4, this is not one of those cases. Compare *Concepcion v. State*, 903 So2d 247, 248-250 (Fla. 1st DCA 2005) (holding that evidence of translation errors in witness' in-court identification of the defendant where witness was the only one who could identify the defendant as the perpetrator of the charged crimes was sufficient to establish prejudice under *Strickland*).

Other evidence supports our conclusion that the alleged errors in interpretation did not deprive appellant of his right to a fair trial. The record demonstrates that appellant spoke English and had no difficulty communicating in English with his counsel both prior to and during trial. Yet, there is no indication that appellant alerted counsel

---

[6] Other alleged errors in interpretation which facially appear more troubling involved witnesses who testified regarding crimes for which appellant was found not guilty or for which his convictions were overturned by the Court of Appeals on insufficiency of the evidence grounds. For this reason, we do not address these allegations of error in this opinion, and we have not considered them in our prejudice analysis under *Strickland*.

or the interpreter assisting him at the defense table to the possibility of interpretation errors. While appellant may have had no legal obligation to bring the alleged errors to the attention of his defense team, we find it significant, in light of the fact that the evidence shows he spoke both Spanish and English, that he himself made no objection to the adequacy of the interpretation. See generally *Joshi*, 896 F2d at 1310 ("A reviewing court is unlikely to find that a defendant received a fundamentally unfair trial due to an inadequate translation in the absence of contemporaneous objections to the quality of the interpretation."). The record also shows that when the courtroom interpreter was uncertain of the correct translation or intended meaning of a question or witness response, she asked the trial court for permission to clarify and, when necessary, conferred with the second interpreter. In the rare instance when she concluded there had been an error in interpretation, she immediately informed the trial court and her interpretation was corrected. Rather than showing that the interpretation was deficient, this evidence demonstrates the interpreter's efforts to provide an accurate translation of the witnesses' testimony. See *Holliday v. State*, 263 Ga. App. 664, 669 (588 SE2d 833) (2003); Georgia Supreme Court Rules for the Use of Interpreters for Non-English Speaking and Hearing Impaired Persons, Appendix C, Code of Professional Responsibility for Interpreters, Standards VI (B), (D) (Interpreters shall "[r]equest clarification of ambiguous statements or unfamiliar vocabulary from the judge or counsel" and shall "[p]romptly notify the court of any error in their interpretation."). Finally, the second interpreter testified on motion for new trial that she listened to the witnesses' statements and the courtroom interpretation throughout trial, that only on one occasion did she consider the interpretation to be inaccurate, that she brought her concern about this inaccuracy to the interpreter's attention, and that after agreeing on the correct translation, the trial court was notified of the error and the record was corrected.

We conclude, therefore, after carefully reviewing the record and considering the full context of the challenged translations, that appellant has failed to demonstrate how the interpreter's interpretation rendered his trial fundamentally unfair. See *Long*, 301 F3d at 1105 (considering errors in interpretation "within the context of the entire trial"). It follows that defense counsel's failure to object to the interpretation did not affect the outcome of the proceedings in this case.

(b) Appellant also contends counsel was ineffective by failing to insist on a hearing to determine the accuracy of the interpretation as

authorized under our Rules for the Use of Interpreters.[7] We agree with appellant that once it became apparent to defense counsel that a Spanish speaking juror was taking issue with portions of the interpreter's interpretation, the information known to defense counsel was sufficient to call into question the accuracy of the official interpretation. We are also in agreement that, at that point, the better course would have been for defense counsel to request a hearing, thereby allowing the trial court to determine during trial whether the interpreter was able to communicate accurately with the non-English speaking witnesses. See Georgia Supreme Court Rules for the Use of Interpreters for Non-English Speaking and Hearing Impaired Persons, Appendix C, Code of Professional Responsibility for Interpreters, Standard VI (A) (Interpreters shall "[p]reserve the level of language used and the ambiguities and nuances of the speaker without editing."). We need not determine in this case whether counsel's failure to request such a hearing constituted deficient performance, however, because, as stated in Division 3 (a) of this opinion, appellant has not satisfied his burden of proving prejudice. Appellant simply has failed to demonstrate that had counsel requested such a hearing, the trial court would have ruled that the courtroom interpretation fell below the constitutionally required standard of accuracy. Accordingly, for the same reasons we conclude appellant failed to meet his burden of proving he was prejudiced by counsel's failure to object to the interpreter's interpretation, he has failed to show sufficient prejudice resulting from counsel's failure to request a hearing on the same subject.

*Judgment affirmed. All the Justices concur.*

DECIDED OCTOBER 17, 2016.

*Yurachek & Associates, Mark A. Yuracheck; Bruce S. Harvey*, for appellant.

---

[7] Section VII (A) (1) of the Rules provides, in pertinent part:
... Where a challenge is made to the accuracy of a translation, the court shall first determine whether the interpreter is able to communicate accurately with and translate information to and from the non-English speaking person. If it is determined that the interpreter cannot perform these functions, arrangements for another interpreter should be made, unless testimony that is cumulative, irrelevant, or immaterial is involved. Where the court determines that the interpreter has the ability to communicate effectively with the non-English speaker, the court shall resolve the issue of the contested translation and the record to be made of the contested testimony in its discretion. ...

*Daniel J. Porter, District Attorney, Christopher M. Quinn, Lisa A. Jones, Assistant District Attorneys*, for appellee.