McMlLLIAN, Judge.
Marquise Markel Daniels was convicted as a party to the crimes of armed robbery, aggravated assault, and possession of a firearm during the commission of a felony in connection with the armed robbery of a convenience store. He appeals following the denial of his motion for new trial, as amended, arguing in his sole enumeration of error that the evidence was insufficient to sustain his convictions. As more fully set forth below, we now affirm.
Properly construed to support the jury’s verdict, Brown v. State, 291 Ga. 750, 752 (1) (733 SE2d 300) (2012), Quincy Driskell, Daniels’ alleged accomplice, testified that on October 8, 2013, Daniels conceived a plan to rob Nick & Sonny’s convenience store, which Daniels believed would be the “easiest target” because he was a “regular” customer in the store and knew the person that worked there. Driskell said the plan was for Daniels to buy a “single” cigarette, and when the clerk opened the cash register, Driskell would draw a gun on the clerk and reach in and grab money out of the register.[1]
Driskell testified that they first went to Daniels’ mother’s house, which was near the store, and then they walked to the store from there. He said as they walked to the store Daniels handed him a mask and a gun to use during the robbery As seen from the store surveillance video, which was played for the jury at trial, Daniels entered the store first and then Driskell walked in almost immediately behind him, positioning himself near the open side of the counter where the cash register was located while Daniels walked around to the front of the counter. The store clerk, who was standing in the back of the store adjusting merchandise when Daniels and Driskell entered, walked up the aisle past Driskell, who turned his face away from the clerk. After the clerk walked behind the counter, Daniels held up one finger to indicate he wanted one cigarette, and the clerk handed him a *838 cigarette and picked up his money off the counter. The clerk then moved back to the cash register and opened it, at which point Driskell, who had placed a mask over his face, walked behind the counter, displayed a gun, and reached toward the register. As shown on the video, Daniels remained leaning on the counter watching from just a few feet away as Driskell brandished the gun and reached his hand toward the register. Daniels then held up his hands and ran out of the store, and Driskell finished grabbing the money and ran out of the store about six seconds later. A witness who lived across from the convenience store testified that he observed the men run out of the store, and that he saw the first man run out and then another man run out behind him “[a]t the most” ten seconds later, and that the men were running “one behind the other,” and in the same direction.[2]
According to Driskell, he and Daniels ran to the woods, where he gave Daniels the money and Daniels covered the gun and mask with leaves and “stuff,”[3] and then they went together to Daniels’ mother’s house. Daniels went inside to ask his mother to give him a ride home, and his mother testified at trial that he told her then that there had been a robbery at the store. Daniels’ mother testified that she did not see Driskell inside her house, but when she went outside to give Daniels a ride, Daniels and Driskell were on the porch together and that Driskell, whom she knew from the neighborhood, asked her if she would also give him a ride. Daniels’ mother testified she dropped off both Driskell and her son at a stop sign located at Maple Heights, where she said Daniels lived with his wife.
Several days after the robbery, Daniels’ mother went to the police station and viewed the surveillance video, explaining that she came forward because she heard there was a reward and wanted to help out the convenience store clerk, who was her friend. The mother identified Driskell as the robber but did not initially tell police that her son was the other person in the video. However, when police began investigating Driskell, they saw that Daniels and he were Facebook friends, and they called Daniels’ mother and asked her to bring him in so they could talk to him. Police then questioned Daniels, and that interview was admitted into evidence and played for the jury at trial. *839 For the entire first hour of the interview, Daniels steadfastly and vehemently denied that he knew who robbed the store and that he knew anyone named Quincy Driskell. However, Daniels eventually admitted that he knew Driskell, although he continued to deny any involvement in the robbery.
Police stopped their interview with Daniels and questioned his mother again about why she did not tell them that her son was the other person shown on the video. During that second interview, the mother also told police for the first time that Driskell had come to her house after the robbery and that she had given Driskell and Daniels a ride to Maple Heights. Police then talked to Daniels again, and he admitted that Driskell was at his mother’s house that night and that she gave them both a ride and dropped them off together at Maple Heights. However, Daniels continued to steadfastly deny to police that he had anything to do with the robbery
Daniels testified in his own defense at trial and admitted that he had known Driskell since approximately 2012. He said he spoke to Driskell as he walked by him on the way into the store but maintained that he was not involved in the robbery and said he had no idea Driskell was going to rob the store. He also testified he did not know why Driskell went to his mother’s house after the robbery, except to opine that maybe Driskell wanted to implicate them in the crime as retribution because Daniels’ mother had rebuffed Driskell’s romantic advances. When asked why he lied to police for over an hour during his interview, he explained that he did not want to be a snitch and that he was scared, but he stated that he decided to tell the truth because he did not want to get into trouble for something he did not do. Based on this and other evidence presented at trial, the jury found Daniels guilty as a party to the crime of armed robbery, aggravated assault, and possession of a firearm during the commission of a felony
Daniels’ sole contention on appeal is that the accomplice’s testimony was not sufficiently corroborated. It is true that under Georgia law, a felony conviction cannot be based solely on the uncorroborated testimony of an accomplice. Cisneros v. State, 299 Ga. 841, 844 (1) (b) (792 SE2d 326) (2016); OCGA § 24-14-8.[4] But
sufficient corroborating evidence may be circumstantial, it may be slight, and it need not of itself be sufficient to warrant a conviction of the crime charged. It must, however, be inde *840 pendent of the accomplice testimony and must directly connect the defendant with the crime, or lead to the inference that he is guilty.
(Citation and punctuation omitted; emphasis supplied.) Threatt v. State, 293 Ga. 549, 551 (1) (748 SE2d 400) (2013). And “evidence of the defendant’s conduct before and after the crime was committed may give rise to an inference that he participated in the crime.” (Citations and punctuation omitted.) Cisneros, 299 Ga. at 845 (1) (b). See Stanbury v. State, 299 Ga. 125, 128 (1) (786 SE2d 672) (2016); Mitchell v. State, 279 Ga. 158, 159-60 (1) (611 SE2d 15) (2005). Further, our law does not require corroboration of every particular of an accomplice’s testimony or that the corroborating evidence match the testimony of the accomplice in every detail. E.g., Threatt, 293 Ga. at 552 (1); Mitchell, 279 Ga. at 159 (1).
Here, Daniels and Driskell entered the store together; Daniels watched as Driskell brandished a gun at the clerk and reached toward the cash drawer; a witness observed the accomplice and Daniels come running out of the store within seconds of each other and continue running in the same direction; they both ran to Daniels’ mother’s house where they caught a ride together; and they both exited Daniels’ mother’s car at the same location. In addition to the inference the jury was allowed to draw from this evidence, the jury was further authorized to consider that Daniels lied to police for over an hour about knowing Driskell and being able to identify the robber, and even after admitting knowing it was Driskell who robbed the store, he continued to withhold the fact that he had seen Driskell again after the crime. E.g., Threatt, 293 Ga. at 551 (1) (defendant’s “demonstrably false statements” to police were corroborating).
It was for the jury to decide the credibility of the witnesses and whether the accomplice’s testimony was sufficiently corroborated, and, as noted above, it was not necessary that each particular of the accomplice’s testimony was corroborated or that the jury determine that the corroborating evidence standing alone was sufficient to convict Daniels. Cisneros, 299 Ga. at 845 (1) (b) (even modus operandi evidence may, by itself, be sufficient to corroborate an accomplice’s testimony identifying defendant as a participant in the crime); Rutledge v. State, 298 Ga. 37, 40 (1) (779 SE2d 275) (2015) (reiterating that slight evidence identifying the accused as a participant in the crime is all that is necessary). Our review shows that the evidence outlined above and other evidence presented at trial was sufficient to authorize Daniels’ conviction as a party to the crimes charged. Accordingly, he is not entitled to reversal on this basis.

*841
Judgment affirmed.

Ellington, P. J., Dillard, Branch, Mercier and Peterson, JJ., concur. Miller, P. J., Phipps, P. J., and McFadden, J., dissent.

 Driskell testified that Daniels wanted Driskell to rob the store because Driskell owed Daniels rent money, but Daniels, his wife, and his mother denied that Driskell lived with Daniels. A forensic psychologist testified that Driskell had an IQ of 71 and had been diagnosed as borderline intellectual functioning, and his aunt testified that he was easily influenced and likely to do what others told him to do.

 When defense counsel attempted to elicit testimony on cross-examination that the second man was not “right behind” the first man, the witness responded, “[n]o, it was right behind each other like — you know, like they came out at the same time or nothing [sic].”

 The gun and mask were never recovered. Driskell testified that he did not tell police about leaving the gun and mask in the woods when he was arrested several months after the crime. Daniels was not arrested until almost five months after the crime, and the lead investigator testified he did not search Daniels’ home.

 This section replaced OCGA § 24-4-8 and has been given the same meaning. Cisneros, 299 Ga. at 844 (1) (b).