**SECOND DIVISION**
**MILLER, P. J.,**
**MERCIER and COOMER, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT.  ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**June 18, 2020**

# In the Court of Appeals of Georgia

A20A0578. BOYNTON v. THE STATE.

MILLER, Presiding Judge.

A Muscogee County jury found Raimone Kanui Boynton guilty of various offenses including armed robbery, aggravated battery, aggravated assault, hijacking of a motor vehicle, and possession of a firearm during the commission of a crime. The trial court sentenced Boynton to life imprisonment followed by a five-year prison sentence, in addition to a 20-year concurrent prison sentence. Boynton appeals from the denial of his motion for new trial, arguing that (1) the State failed to corroborate the testimony of a witness; (2) the trial court erred by requiring him to display his tattoos to the jury; (3) his trial counsel rendered ineffective assistance of counsel by failing to object to him having to display his tattoos to the jury; (4) the trial court erred by permitting hearsay testimony during the trial; and (5) his trial counsel

rendered ineffective assistance of counsel by failing to object to the admission of hearsay testimony. For the reasons that follow, we affirm.

Viewed in the light most favorable to the verdicts,[1] the record shows that on August 23, 2008, while a cashier was working at a Circle K convenience store, two masked men entered the store and held her at gunpoint. The men ordered three customers to the ground and asked the cashier for the money, and the cashier complied. One of the men took a customer's purse and pistol-whipped her. The customer testified that one of the men had long, straight hair, and she testified that Richard Boynton had the same hair.

After the armed robbery, Boynton, who was Richard Boynton's cousin, drove Richard and Nigel Towler to the home of Demarco Jones. Richard and Jones had known each other since elementary school and lived a block away from each other. Richard told Jones that he had just robbed a gas station, that he and Towler had guns, and that Raimone had driven them to the store but did not enter because he had feared that his sister, who worked there, would recognize him. Towler also testified that he and Richard had committed the armed robbery and that Boynton was the driver.

---

[1] *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

Days after the Circle K armed robbery, armed men robbed a Sonic restaurant down the street from the Circle K convenience store. Two men entered the store, and one pointed a gun at an employee and told her that she had ten seconds to open the safe. She complied, and the men took money from the safe and left. The employee testified that one of the men who robbed the store had a tattoo bearing the name "Neveah," and during trial she identified this same tattoo on Boynton's forearm and also identified Boynton as the man who robbed her. After the robbery, Richard told Jones that he and Boynton had robbed the Sonic restaurant and gave details of the robbery, explaining that the woman who sat by the safe had been moving too slowly and that he hit her multiple times. Richard showed Jones the money taken from the robbery and he also told Towler that he and Boynton "went in" on the armed robbery.

In October 2008, while Elliott Charobee and a co-worker stocked shelves at another Circle K convenience store in Muscogee County, two masked men entered the store, one of whom pointed a gun at Charobee. One of the men hit Charobee in the left eye with his gun, and the men told Charobee to give them the money. When Charobee turned over $36 from his register, he was hit in the face again. The armed man pointed the gun at Charobee's co-worker and said, "[M]aybe we should kill one of these guys," and the men took an additional $100 from a safe. Charobee suffered

3

a crushed cheekbone, and his injuries required stitches. The men wore black outfits, one of the men wore a ski mask, and the left eye of the man who hit Charobee seemed "a little squinted." During trial, Charobee identified Richard as having a "sunken" left eye similar to that of the man who had hit him with the gun, and he indicated that Richard was the same height, build, and skin tone as that man. Charobee also identified a gun that was recovered from Richard as the same gun that was used by his attacker, and that a ski mask recovered from Richard appeared to be the same ski mask as that worn by his attacker. Charobee also said that Boynton matched the description of one of his attackers.

The following month, two armed men entered a Little Caesars restaurant, one of whom pointed a gun at the assistant manager and told her to open the cash register. Another employee opened the register, and the men removed money from it. They began to leave, but the man who had held the gun to the assistant manager punched her in the jaw, fracturing it, loosening two of her teeth, and bursting open her lip. One of the men wore a ski mask, and the other wore a bandana over his face. Jones testified that Richard told him that he and Ladarius Colbert had gone into the restaurant, that Raimone had driven them, that he went to the restaurant to "rob them and to get back at somebody," and that the assistant manager's boyfriend had

4

"jumped on" him. Richard also told Towler that he had robbed Little Caesars for revenge because he had been "jumped" by some men. Ladarius Colbert also spoke with Jones about the robbery, and Colbert told him that he went into the store with Richard and that afterward, he had seen an old man whom he suspected gave law enforcement a description of Raimone's car.

Less than two weeks after the Little Caesars robbery, Joseph Best was the victim of an armed robbery. Best testified that Jasmine Arrington, a female companion, asked him to meet her at the Renaissance Apartments complex. He agreed, and, while he sat in his car with Arrington, two men pointed guns at him and ordered him out of the car. One of the men wore a ski mask, and the other wore a bandana. As Best exited the car, one of the men hit him in the head with a gun, and both men beat, kicked, and hit him. The men took Best's car and his cellular phone. As he fled the scene, Best said that he heard the sound of a gunshot. Best recognized the voice of Ladarius Colbert, with whom he attended high school, as one of the men involved in the robbery, and Richard's height, weight, and body type matched that of the other man who had robbed him.

Arrington testified that on the night of the armed robbery against Best, Richard picked her up, that Boynton and Colbert were in the car, and approximately three

5

guns were in the car.[2] They all went to the Renaissance Apartments, at which time the men began plotting to rob Best. The men told Arrington to call Best and offer him marijuana, and once Best arrived at the complex, they told Arrington to get in his car. Arrington saw Richard and Colbert "aiming the gun" at Best, beating him with it, and kicking him. She also saw Best running and heard a gunshot, and Richard later told her that he tried to shoot Best. Richard and Colbert drove Arrington away from the scene to meet Boynton, who had driven Best's car and had also removed the stereo.

Boynton was later indicted on seven counts of armed robbery (OCGA § 16-8-41), three counts of aggravated assault (OCGA § 16-5-21), five counts of possession of a firearm during the commission of a crime (OCGA § 16-11-106), two counts of aggravated battery (OCGA § 16-5-24), and one count of hijacking of a motor vehicle (OCGA § 16-5-44.1). The jury acquitted Boynton of one count of aggravated assault and found him guilty on all other counts. Boynton was sentenced to life imprisonment followed by a five-year prison sentence, in addition to a 20-year concurrent prison sentence. Boynton subsequently filed a motion for new trial on November 12, 2009, which he later amended. In ruling on the motion, the trial court vacated one of

---

[2] Arrington was arrested and charged in connection with the offenses involving Best.

6

Boynton's convictions for aggravated assault and denied the other claims. This appeal followed.

1. First, Boynton argues that the State failed to produce corroborating evidence of Jasmine Arrington's testimony that he was involved in the offenses involving victim Best.[3] We disagree.

It is well settled that "[w]hen the only witness is an accomplice, corroborating evidence is required to support a guilty verdict." *Raines v. State*, 304 Ga. 582, 587 (2) (a) (820 SE2d 679) (2018); see also OCGA § 24-14-8.

Although OCGA § 24-14-8 provides that corroboration is required to support a guilty verdict in felony cases where the only witness is an accomplice, only slight evidence of corroboration is required. The necessary corroboration may consist entirely of circumstantial evidence, and evidence of the defendant's conduct before and after the crime was committed may give rise to an inference that he participated in the crime. The evidence need not be sufficient in and of itself to warrant a conviction, so long as it is independent of the accomplice's testimony and directly connects the defendant to the crime or leads to the inference of guilt. The sufficiency of the corroboration is a matter for the jury to decide. And in considering sufficiency, we must consider all the

_____

[3] Arrington was arrested and charged in connection with the offenses involving Best.

7

evidence admitted by the trial court, regardless of whether that evidence was admitted erroneously.

(Citations and punctuation omitted.) Id. at 588 (2) (a). "Further, our law does not require corroboration of every particular of an accomplice's testimony or that the corroborating evidence match the testimony of the accomplice in every detail." *Daniels v. State*, 339 Ga. App. 837, 840 (795 SE2d 94) (2016).

Here, in recounting the details of the offenses involving Best, Arrington testified that she called Best and that he drove to her apartment complex after speaking with her. She testified that after Best arrived at her apartment complex, she got into his vehicle. After sitting in Best's vehicle, Colbert and Richard pointed a gun at Best and ordered him out the car. She testified that after Best had been pulled from his car and was beaten, Best was taken behind a building. Arrington explained that Best then ran away, and that after he ran away she heard the sound of a gunshot. Best also testified that Arrington called him, and that he drove to her apartment complex after speaking with her. After arriving at the apartment complex, Arrington got into his vehicle. He testified that two men appeared, and that both of the men pointed guns at him and ordered him out the car. Best also explained that he was beaten after being forced out of his car. Additionally, he testified that he heard the sound of a gunshot

8

as he fled from the scene. Accordingly, we conclude that there was sufficient evidence through victim Best's testimony to corroborate Arrington's testimony regarding Boynton's involvement in the commission of the crimes involving victim Best. See *Johnson v. State*, 288 Ga. 803, 806 (2) (708 SE2d 331) (2011) (holding that the State presented sufficient corroborating evidence of the accomplice's testimony where the testimony of the victim and another witness supported the accomplice's testimony identifying Johnson as the shooter).

2. Next, Boynton argues that the trial court erred by requiring him to stand and display his tattoos for the jury in violation of his right against self-incrimination. Specifically, Boynton argues that the trial court compelled him to exhibit his tattoos for the jury, to stand for the jury, and to turn around to allow a witness to examine a tattoo on his neck. We conclude that, although these required actions violated Boynton's right against self-incrimination, the errors were nevertheless harmless in light of the overwhelming evidence of Boynton's guilt for the offenses.

"The Georgia Constitution provides that no person shall be compelled to give testimony tending in any manner to be self-incriminating." (Citation and punctuation omitted.) *Olevik v. State*, 302 Ga. 228, 235 (2) (c) (806 SE2d 505) (2017). However, unlike the Fifth Amendment of the United States Constitution, the Georgia

Constitution "protects individuals against being compelled to generate evidence against themselves through *acts* as well as *statements*." (Emphasis in original.) *State v. Herrera-Bustamante*, 304 Ga. 259, 262 (2) (818 SE2d 552) (2018). "Although the scope of our right against compelled self-incrimination extends to acts, it is only compelled acts of the defendant that fall within the protections of [our] [Constitution]." (Emphasis omitted.) *Olevik*, supra, 302 Ga. at 241 (2) (c) (iii). Therefore, our Supreme Court has noted that the right against self-incrimination has been violated in instances where a defendant was required to place his foot in certain footprints located near the crime scene, where the defendant was required to stand up at trial so that a witness could verify that the defendant's leg had been amputated, and where a defendant was required to produce handwriting exemplars. Id. at 241-242 (2) (c) (iii).

Here, while a Sonic employee testified about the robbery, the trial court required Boynton to stand in front of the jury and unbutton his sleeves to display his tattoo for the jury. Boynton was also required to stand for a Circle K employee to assess his height and turn around to allow another Circle K employee to examine a tattoo on his neck. Additionally, Boynton was made to stand during a portion of the prosecutor's closing argument. We conclude that these actions violated Boynton's

right against self-incrimination. See *Olevik*, supra, 302 Ga. at 241 (2) (c) (iii) (noting that a defendant's right against self-incrimination was violated where a defendant was required to stand at trial so that a witness could verify that his leg had been amputated in a certain manner).[4] Nevertheless, we conclude that such errors were harmless because the State presented other overwhelming evidence of Boynton's guilt for the offenses. See *Hadley. v. State*, 237 Ga. App. 735, 738 (510 SE2d 569) (1998) (applying harmless error review to violation of defendant's right against self-incrimination and holding that the violation of the defendant's right against self-incrimination was harmless where the evidence of guilt was overwhelming). Therefore, in this case we conclude beyond a reasonable doubt that the violation of Boynton's right against self-incrimination was harmless error.

---

[4] The State's reliance on *Ingram v. State*, 253 Ga. 622 (323 SE2d 801) (1984) is misplaced, as that case did not involve the defendant having to stand in front of a jury but was instead required to have his photographs taken by police after his arrest. Id. at 634 (7).

3. Next, Boynton argues that the trial court erred by allowing hearsay testimony into evidence.[5] We conclude that the trial court did not err by allowing hearsay into evidence.[6]

"Decisions by the trial court with regard to admission of evidence pursuant to a hearsay objection are reviewed for abuse of discretion." (Citation omitted.) *Gregory v. State*, 342 Ga. App. 411, 416 (2) (803 SE2d 367) (2017).

Former OCGA § 24-3-5 provided that "after the fact of conspiracy is proved, the declarations by any one of the conspirators during the pendency of the criminal project shall be admissible against all." "However, in order for co-conspirator hearsay testimony to be admissible, the State must establish, prior to the close of evidence, a prima facie case of conspiracy apart from the co-conspirator's statement." (Citation and punctuation omitted; emphasis omitted.) *Terrell v. State*, 300 Ga. 81, 85 (2) (793 SE2d 411) (2016). "A person commits the offense of conspiracy to commit a crime when he together with one or more persons conspires to commit any crime and any

---

[5] We address Boynton's enumerations of error in a different order than raised in his brief.

[6] Because the trial in this case occurred prior to January 1, 2013, the old evidence code applies. See Ga. L. 2011, pp. 99, 214, § 101 (stating that Georgia's current Evidence Code applies "to any motion made or hearing or trial commenced on or after" January 1, 2013).

one or more of such persons does any overt act to effect the object of the conspiracy[.]" (Citation omitted.) Id.

> In order for a conspiracy to exist, there must be an agreement between two or more persons to commit a crime. Such agreement need not be express, nor does it require a 'meeting of the minds' to the same degree necessary to form a contract; all that is required is a tacit mutual understanding between persons to pursue a common criminal objective. For purposes of the hearsay exception, a conspiracy is deemed to endure so long as the parties thereto attempt to conceal either the crime itself or the identity of the perpetrators. A conspiracy may be proven by any direct or circumstantial evidence which discloses a common design to act in concert for the accomplishment of an unlawful purpose. And, to obtain the admission of an inculpatory out-of-court statement under former OCGA § 24-3-5, the prosecution need only show that it was made by a co-conspirator during and in furtherance of an ongoing conspiracy with the defendant.

(Citations and punctuation omitted.) Id. at 85-86 (2). Additionally, statements made recounting the details of the offenses were also admissible under former OCGA § 24-3-5. See *Marchman v. State*, 299 Ga. 534, 544-545 (9) (787 SE2d 734) (2016). Statements made during the course of the investigation while the conspirators remain at large have also been held to be admissible under former OCGA § 24-3-5. *Franklin v. State*, 298 Ga. 636, 639-640 (2) (784 SE2d 359) (2016).

13

Here, the evidence shows that Boynton and Richard committed several robberies together, including Circle K, Sonic, and Little Caesars, and the State therefore proved that a conspiracy existed between Boynton and Richard. Jones testified that Richard told him that Boynton was the driver of the vehicle during the Circle K, Sonic, and Little Caesar robberies. Towler also testified that Richard told him that Boynton was the driver of the vehicle during the Sonic and Little Caesar robberies. The statements made by Richard were made during the course of the investigation and while Boynton and Richard remained at large. Accordingly, the statements made by Richard were admissible under former OCGA § 24-3-5.

4. Lastly, Boynton argues that trial counsel rendered ineffective assistance by failing to object to him having to display his tattoos to the jury and by failing to object on the basis of hearsay to the testimony by Jones and Towler. We conclude that Boynton has failed to establish his ineffective assistance of counsel claim.

> To prevail on a claim of ineffective assistance of counsel, a defendant must show that counsel's performance was deficient and that the deficient performance so prejudiced the defendant that there is a reasonable likelihood that, but for counsel's errors, the outcome of the trial would have been different. If an appellant fails to meet his or her

14

burden of proving either prong of the *Strickland*[7] test, the reviewing court does not have to examine the other prong. In reviewing the trial court's decision, we accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts. Furthermore, there is a strong presumption that the performance of counsel was within the wide range of reasonable professional lawyering, and we cannot reach a contrary conclusion unless defendant successfully rebuts the presumption by clear and convincing evidence. Judicial scrutiny of counsel's performance must be highly deferential.

(Citation omitted.) *Bearden v. State*, 316 Ga. App. 721, 725 (3) (728 SE2d 874) (2012).

(a) As to Boynton's claim that his trial counsel was ineffective by failing to object to him having to display his tattoos to the jury, at the hearing on Boynton's motion for new trial, trial counsel testified that he did not believe that having Boynton stand and display his tattoos violated Boynton's right against self-incrimination. As we held in Division 2, however, Boynton's constitutional right against self-incrimination was violated when the trial court required him to display his tattoos for the jury and a state witness. Nevertheless, we conclude that Boynton cannot establish

---

[7] *Strickland v. Washington*, 466 U. S. 668 (104 SCt 2052, 80 LE2d 674) (1984).

15

that he suffered prejudice. As stated previously, there was overwhelming evidence of Boynton's guilt for the offenses such that he cannot show a reasonable probability that the outcome of the trial would have been different. Therefore, Boynton's ineffectiveness claim here fails. See *Mack v. State*, 306 Ga. 607, 611 (4) (a) (832 SE2d 415) (2019) (holding that defendant's ineffectiveness claim based on trial counsel's failure to object failed where the evidence of the defendant's guilt was overwhelming).

(b) As to Boynton's claim that trial counsel was ineffective for failing to object to the portions of testimony from Jones and Towler which implicated him in the offenses, as we held in Division 3, the statements were properly admitted under former OCGA § 24-3-5. Therefore, any objection made by trial counsel on this basis would have been meritless. Accordingly, Boynton has failed to show that trial counsel performed deficiently in failing to object on this basis. See *Ivey v. State*, 305 Ga. 156, 162 (2) (c) (824 SE2d 242) (2019) (holding that the failure to raise a meritless objection does not constitute deficient performance).

Accordingly, for the reasons stated above, we affirm the trial court's order denying Boynton's motion for new trial.

*Judgment affirmed. Mercier and Coomer, JJ., concur.*

16